674 So.2d 24 (1995)
Dee-Witt C. SPERAU, et al.
v.
FORD MOTOR COMPANY, et al.
1931473, 1931591 and 1931629.
Supreme Court of Alabama.
June 9, 1995.
Rehearing Denied August 18, 1995.
*26 Lee H. Copeland of Copeland, Franco, Screws & Gill, John A. Taber of Taber & Dansby, H. Lewis Gillis of Thomas, Means & Gillis, Maston E. Martin, Jr. of Fazekas & Martin, Montgomery, for Sperau, et al.
Tabor R. Novak, Jr. and Clyde C. Owen, Jr. of Ball, Ball, Matthews & Novak, P.A., Montgomery, Andrew L. Frey and Evan M. Tager of Mayer, Brown & Platt, Washington, DC, for Ford Motor Co.
Tabor R. Novak, Jr. and Clyde C. Owen, Jr. of Ball, Ball, Matthews & Novak, P.A., Montgomery, for Ford Motor Credit Co.
Charles L. Robinson and William D. Jones III of Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, amicus curiae American Automobile Manufacturers Association, in support of Ford Motor Co., et al.
PER CURIAM.
This is a fraud case arising out of the purchase of a Ford Motor Company dealership in Selma, Alabama by Samuel R. Foster, II, an African-American minority dealer candidate in Ford Motor Company's Minority Dealer Program, and Dee-Witt C. Sperau, Foster's business partner. This Ford dealership was operated by these plaintiffs under the name of "River City Ford" from May 11, 1988, until the failure of the business in January, 1991.
Foster and Sperau filed a complaint against Ford Motor Company on May 15, 1991, alleging fraud, breach of contract, and violation of the Motor Vehicle Franchise Act, § 8-20-1 et seq., Code of Alabama 1975. Their complaint was first amended to contain a count for civil conspiracy, and again *27 amended to name Sperau's wife, Diane, and Foster's wife, Chandra, as plaintiffs. The second amended complaint made claims for fraud, deceit and fraudulent suppression against Ford Motor Company, Ford Motor Credit Company and Gary L. Birdsong.[1] The basis of the Plaintiffs' claims were that Ford personnel represented to them that the sales and profit forecast and capitalization requirements provided to them were reasonable, and that the plaintiffs could rely on the numbers contained therein to make their decision to acquire the Ford dealership in Selma. The plaintiffs claimed that the representations were made in order to induce them to purchase the Ford dealership and with an intent to deceive them, based upon Ford Motor Company's knowledge that minority dealerships were less successful than the average dealership. It is the plaintiffs' contention that Ford Motor Company was under a duty, because of a confidential relationship and/or special circumstances, to disclose to them all material facts concerning the profitability, performance, and failure rates of minority dealers as reflected in the Equal Opportunity Progress Reports ("EOP Reports") to which only Ford Motor Company had access.
The defendants filed separate answers and motions to dismiss. In addition, Ford Motor Credit Company asserted a counterclaim against the plaintiffs, as guarantors on the debts of River City Ford. The plaintiffs answered, asserting affirmatively the defenses of estoppel, waiver, and unclean hands.
The first trial of the case commenced on March 29, 1993. The trial judge directed a mistrial in the case, based on the inability of the jury to reach a unanimous verdict. The defendants filed notice of appeal with the Supreme Court of Alabama; this Court struck the appeal. The defendants also sought a writ of mandamus on the basis of the trial court's rulings on their post trial motions. The petition for writ of mandamus was denied.
Prior to the second trial of the case, the trial court issued its order concerning various pretrial motions.[2] This order of February 14, 1994, dismissed all claims of plaintiffs Diane Sperau and Chandra Foster and dismissed the fraud claims of Sperau and Foster against Ford Motor Credit Company and Gary Birdsong.
The case then came on to be tried. On February 18, 1994, at the close of the plaintiffs' evidence, the trial court granted a directed verdict on the breach of contract claims of Foster and Sperau to Ford Motor Credit Company. The trial court also directed a verdict on plaintiffs' claims that Ford personnel had made misrepresentations regarding the rate of success and profitability of minority dealers. Finally, the trial court directed a verdict in favor of Ford Motor Credit Company and Gary Birdsong on all aspects of plaintiffs' fraud claim and in favor of all defendants on the conspiracy claim. The case went to the jury only on Foster and Sperau's fraud and suppression claims against Ford in connection with the capitalization and the sales and profits forecasts and Ford Motor Credit's contract claim against Foster, Dee-Witt Sperau, and Diane Sperau. The jury reached a verdict on February 23, 1994 as follows:
"We the jury, find for the plaintiffs on their claim of fraud and assess damages as follows:

1. Compensatory damages
 Economic loss $ 992,000.00
 _____________
 Mental anguish for Samuel Foster, Jr. $2,500,000.00
 _____________
 Mental anguish for Dee-Witt C. Sperau $1,000,000.00
 _____________
2. Punitive damages $6,000,000.00
 _____________

It is our intention to assess total damages in the amount of $10,492,000.00."
In addition, the jury found for the defendant Ford Motor Credit Company against plaintiffs Dee-Witt Sperau, Samuel Foster and Diane Sperau on the counter-claim of Ford Motor Credit Company and assessed *28 damages in the amount of $635,000.00. At the request of the defendants, the trial judge polled each of the jurors, and each juror affirmed that the verdict was his or her verdict.
Ford Motor Company filed numerous post-trial motions and the trial judge conducted an extensive Hammond hearing on April 28-29, 1994.[3] The trial judge heard oral argument and received evidence on Ford Motor Company's motion for a new trial, motion for JNOV, motion for remittitur of damages and motion for review of punitive damages award.
On June 29, 1994, the trial court issued its order affirming the jury's verdict and denying Ford Motor Company's post-trial motions, with the exception of the motion for a new trial. The trial judge granted a new trial conditioned upon the plaintiff's acceptance of a remittitur of the mental anguish award for Dee-Witt Sperau to $200,000 and for Samuel Foster to $500,000. This remittitur was accepted by the plaintiffs on July 1, 1994. The total amount of judgment as remitted was $7,692,000.
On the same day, the plaintiffs filed their notice of appeal to this Court, based upon the trial court's dismissal in favor of Ford Motor Company and against Diane Sperau and Chandra Foster on their fraud claim, and the trial court's granting of a directed verdict on plaintiff's contract claim in favor of Ford Motor Credit Company and against Dee-Witt Sperau and Samuel Foster. On August 12, 1994, Ford Motor Company filed its cross-appeal. On August 16, 1994, Plaintiffs Dee-Witt Sperau and Samuel Foster filed their cross-appeal, seeking reinstatement of the jury's entire award for mental anguish.

Factual Background
In the 1960's the Ford Motor Company initiated a Minority Dealer Program. At the time the program was initiated, there were over 5,000 Ford and Lincoln-Mercury dealers in the country, with only 20 to 30 being operated by African-Americans. The Minority Dealer Program is a part of a larger program called the Ford Dealer Development Program. By the 1980's, the program's primary emphasis had turned to efforts to recruit African-Americans to become franchised dealers. Ford provides these minority "private capital" dealers with benefits that include special training and assistance from consultants. These "private capital" minority dealers may also apply for "launch costs" for opening the dealership and to a special parts return, under which Ford pays them in full for any obsolete or otherwise unwanted parts that are in their inventory a year and a half after the acquisition of the dealership.[4] Ford also has a "Dealer Development" program that requires the candidate for a dealership to raise 20% of the capital requirement. Because many minority candidates have difficulty raising the 20%, Ford can reduce the requirement to as low as 10%.
Each year, Ford management presents Equal Opportunity Progress Reports ("EOP Reports") to Ford Motor Company's board of directors, as a means of describing progress in achieving stated goals of the Minority Dealer Program. The EOP Reports show that, historically, the average return on investment for African-American dealers is lower than the average return on investment for all Ford and Lincoln-Mercury dealers. Ford management, through these reports, gained knowledge of material facts, regarding the historic performance of African-American dealers participating in Ford's Minority Dealer Program, and of factors bearing on the success and failure of these dealers. This information was not otherwise available to African-American dealers, unless Ford chose to reveal it to them.
The October, 1984, EOP Report reflected that as of August, 1984, the return on guide investment for all Ford and Lincoln-Mercury dealers was 53%, a record high, while the return for African-American dealers was 25%. The October, 1985 EOP Report, expressed the concern that a higher percentage *29 of African-American dealers (34%), were in a loss position compared to the total dealer body (16%) at a time of record dealer profits in a strong automotive industry. In December, 1984, Ford issued a "Blue Letter" in which a goal of 320 African-American dealers by year-end 1989 was set by the Executive Vice-President of Ford's North American Operations, Harold Pohling. In order to accomplish this goal, district managers were assigned objectives for their sales districts, and this became a factor in the performance evaluations of Ford district managers and market representation managers. Beginning in October, 1985, Ford management began to actively recruit private capital African-American dealer candidates. The October, 1986, EOP Report acknowledged the difficulty of recruiting candidates with the required unencumbered capital of $350,000. The 1986 EOP Report also reflected that the year end return on guide investment for the black dealer body was 13%, compared to 39% for all Ford and Lincoln-Mercury dealers. Among the factors stated in the EOP Report as contributing to the differences in the performance of African-American dealers were 1) because many of the newly appointed dealers were relatively new to the business and lacked management experience; 2) that their dealerships were in the early stages of development and were still encountering start-up costs; and 3) that the more profitable dealerships of African-Americans had been in business longer than two years.
The EOP Report of October, 1987, states: "Because of the marginal profitability of newly appointed dealers, and our aggressive black dealer appointment target, we will continue to have a high number of black loss dealers until they have gained more retail experience." The EOP Report of October, 1988, states "... we can expect to have a high number of black loss dealers until they have gained more retail experience." That EOP Report also showed that for year-end 1987, the average return on guide investment for black dealers was 17%, which was 20% below the total dealer body. The EOP Report of October, 1989, stated:
Black dealer profits declined from $16.7 million in 1987 to $11.2 million in 1988. During the first several months of 1989, black dealers lost $18.3 million compared with a $19 million profit during the same period in 1988, a year-over-year decline of more than $37 million.
As of July 31, 1989, 66% of all African-American Ford dealers were in a loss position.
It is undisputed that Ford did not disclose the facts reflected in the EOP Reports to its African-American dealer candidates. Instead, African-American dealer candidates were provided sales and profit forecasts, reflecting returns on investment for dealer points which, in this case, was as high as 65.4%. Ford management's decision to suppress the material facts was motivated by their objective to aggressively increase Ford's count of African-American dealers.
The testimony of Ford management was that Ford promoted the minority dealer program to enhance its corporate image and to increase sales. Ford recognized that the loss of African-American dealers was a problem not only for Ford, but for General Motors and Chrysler as well. The EOP Report of October, 1987, states: "While the percent of loss black dealers (23%) is higher than the national average, it does compare favorably to General Motors and Chrysler (28%), despite the fact that General Motors and Chrysler have less aggressive appointment activity which should serve to lower their percent of loss black dealers." Ford management believed that it was significant to have more African-American dealers than did Chrysler and General Motors, based upon the perceived benefit of improved corporate image. The second objective Ford sought was an increase in sales. Ford's Manager of Dealer Operations for the Eastern United States, Robert Sullivan, testified that 12.5% of the population is African-American, while only 5% of the population are Ford customers.
Ford also profited from a continued market presence in less desirable geographic locations by arranging sales of dealerships to African-American dealer candidates in those locations. Ford Motor explained Ford Credit's loss "in part from the geographic and *30 demographic disadvantages that many black dealers face because of geographic location."
In order to accomplish its goal of increasing the count of African-American dealers, Ford management assigned objectives to its district managers for their particular sales districts. Those objectives were a factor in the performance evaluations of Ford district managers and market representation managers.
In 1987, both plaintiffs were engaged in the construction business in North Carolina. Foster was the owner and general manager of Foster Construction Company. Sperau was the financial director and assistant general manager of the same company. Foster regularly attended monthly social gatherings of African-American professionals in the Charlotte area, known as "First Fridays." There, he frequently saw Cornelius Willingham, an employee in Ford's District Sales Office in Charlotte, North Carolina. Foster and Willingham discussed acquaintances who were successful minority dealers and Ford's Minority Dealer Program. Foster had some familiarity with the program by virtue of an article in Black Enterprise magazine. Foster testified that Willingham told him that the vast majority of African-American dealers participating in the program were making profits and receiving a good return on their investment.
Foster then received a call from Ken Cooper, Ford's Market Representation Manager for the Charlotte, North Carolina, District Sales Office to arrange a meeting to discuss Ford's Minority Dealer Program. Foster testified that Cooper told him in their meeting that the majority of black dealers had been successful and profitable and had received a good return on their investment. Cooper gave Foster a dealership application.
In November of 1987, after submitting the application, Foster met with Mike Shanks, Ford Sales Manager for the Atlanta Region, and Ken Cooper. Since Foster had no experience in the automobile business, it was suggested that Foster take on an experienced partner to participate in the Minority Dealer Program. Following this meeting, Foster spoke with Dee-Witt Sperau, who had some experience in the industry.
In January, 1988, Sperau and Foster attended a meeting with Ken Cooper. Foster testified Cooper told them that a vast majority of the black dealers were successful and making a profit. Foster indicated a lack of interest in the minority dealer training program, because he did not want to leave his business in Charlotte to train full-time, and because his position on the Board of Trustees of the University of South Carolina required him to live in the judicial circuit from which he was elected. Cooper provided Sperau with a dealer application, which Sperau completed and submitted to Ford on January 20, 1988. Later that month, Foster and Sperau had a second meeting with Cooper to discuss the potential for a dealership opportunity in the Carolinas.
About that same time, Foster again spoke with Willingham, who had joined the Atlanta District Sales office. Willingham requested that Foster send him a copy of an Ebony magazine article, which named Foster as one of 30 influential young African-Americans. Willingham gave the article to Don Kitchens, the Atlanta District Market Representation Manager. Kitchens and his superiors were impressed by the article and by Foster and Sperau's resumes. Foster and Sperau were invited to a meeting in Atlanta where they met with Kitchens; Bill Stang, Ford's Atlanta district sales manager; and Dale Wendell, assistant district sales manager. Foster testified that at this meeting these Ford managers expressed to him that they were very serious about appointing African-American dealers in the Southeast. Don Kitchens admitted in his testimony that, during his recruitment of Foster, he probably told him that the vast majority of Ford minority dealers were profitable. Foster repeated that he wanted to remain in the Carolinas.
Ford personnel found Foster and Sperau to be good dealer candidates: Foster had experience in banking, real estate, and the construction business. He was a graduate of the University of South Carolina and was the first African-American ever appointed to its Board of Trustees. Sperau had attended Benjamin Franklin University where he studied finance and accounting, graduating in *31 1968. He had worked in the automobile business in Rockville, Maryland, and worked for Ford Motor Company in dealer development, although for less than a year.
In February 1988, Foster received a telephone call from Don Kitchens, who stated that he knew that Foster wanted to stay in the Carolinas, but that there were good opportunities available in the Atlanta District and that a specific opportunity was available in Selma, Alabama, where a dealer had died. Kitchens sent a "sales and profit forecast" of the dealership by facsimile transmission to Foster. The profit and sales forecast showed a return on investment of 56% and contained a capital requirement of $632,000.00. Foster and Sperau visited the dealership, accompanied by Ronnie Bortnick, a friend of Sperau's, who owned a Maryland Ford dealership.
After the Selma visit, Sperau and Foster decided not to pursue the dealership. They called Kitchens and told him they were not interested because of the $632,000 capitalization requirement, because Selma was not in the Carolinas, and because the dealership could not support two families. Foster reiterated to Kitchens that they wanted a dealership closer to Foster's home. Kitchens then called Foster and told him he was sending a revised sales and profit forecast and capitalization requirement. The revised forecast reduced the capital the men would need to operate the dealership from $632,000 to $535,000 and increased the estimated return on capital from 56% to 65.4%. Foster testified that he questioned Kitchens concerning the differences between the two forecasts, and that Kitchens told him he had looked at the market again and that $535,000 would adequately capitalize the dealership and that Foster and Sperau could rely on the sales and profit forecast and capitalization requirement. Kitchens testified at trial that the revised forecast was based upon spending less money for the acquisition of used cars than was projected in the first forecast. He also testified that he concluded the dealership would need less money for parts.
Foster and Sperau met again with Kitchens, Wendell and Stang in Atlanta to discuss the Selma dealership on March 1, 1988. At this meeting, the Minority Dealer Program was discussed and Stang encouraged Foster to secure the financing. Foster testified that Kitchens again assured him that the sales and profit forecast and capitalization requirement were reliable and asked him to go forward with investing in the Selma dealership.
On March 11, 1988, Sperau and Foster entered into a buy/sell agreement with the seller of the Selma dealership. Under the agreement, Foster and Sperau were not obligated to acquire the dealership and its property until they obtained Ford's approval and secured financing. They then sought the capital necessary to buy the dealership. They raised 50% of the necessary capital from their own funds, a loan from Foster's father, a loan from a friend, and a bank loan. They borrowed the remaining 50% of the capital, $285,000, from Ford Motor Credit Company.
On March 22, 1988, Don Kitchens arranged for Foster and Sperau to meet with Gary Birdsong and Arlen Williams of Ford Motor Credit's Dothan office. The purpose of the meeting was to discuss a loan for the River City dealership with Ford Motor Credit Company. This included $1,000,000 for a wholesale credit line; $400,000 for a mortgage loan to purchase the building; and a $320,000 capital loan to operate the business. Foster submitted the loan documents to Birdsong and Williams who were to perform the credit investigation and analysis for submission of the River City loan package to the Ford Credit office in Dearborn, Michigan. Birdsong recommended to this Ford Credit office that the River City application be rejected on the grounds that the tangible based capital and working capital appeared inadequate. The loan application had a numerical rating of - 128 on a scale of + 118 to - 246. A Ford Credit staff operations manager, Mr. Cottingham, also recommended that the loan be rejected, as did his superior, Mr. Chadwick.
Ultimately, the executive vice-president of Ford Credit, Don Cook, prepared a memorandum rejecting the River City loan application which had reduced the capital loan from $320,000 to $285,000, requiring additional investment *32 by Foster and Sperau of $35,000.00. Neither Ford Credit nor anyone with Ford communicated to the plaintiffs that Ford Credit had rejected their application for a capital loan. Don Kitchens simply told Foster and Sperau that the dealership would be stronger if they put up an additional $35,000. At trial, Ford's Bill Stang admitted that he spoke with Don Cook at Ford Credit about the River City loan application. He submitted a cover letter with the appointment file for Foster and Sperau, recommending approval of the loan. On April 26, 1988, the capital loan was approved, however Ford Credit required that Foster, Sperau and their wives personally guarantee it.
Foster and Sperau obtained Ford's approval as operators of the dealership by agreeing that Foster would own a majority, 56%, of the stock, but would not run the dealership. Instead, he would come to Selma one week each month. Under that same agreement, Sperau was to operate the dealership on a day-to-day basis.
On May 11, 1988, the dealership began operations under the name "River City Ford." During the seven months of operation in calendar year 1988, River City Ford had gross profits of $102,682. In the second year of operation, River City Ford realized a loss of $4,124, despite posting new vehicle sales of $4,689,041 and parts sales of $463,108. By October 4, 1989, Ford Credit identified River City Ford as being in financial trouble and Ford Credit personnel requested permission to do a physical audit due to the poor financial condition of the dealership. By 1990, Sperau recognized that the dealership did not have enough capital to cover inventory to do business.
On March 8, 1990, River City Ford borrowed an additional $72,000 from Ford Motor Credit, taking the capital loan balance back to $285,000. River City Ford had a year-end loss of $6,347 for 1990 despite the fact that new vehicle sales were $4,689,114 and parts sales of $407,188. By January, 1991, the dealership was "out of trust" with Ford Motor Credit. Sperau and Foster met with Gary Birdsong and Arlen Williams from Ford Motor Credit in an effort to resolve the problem. Being unable to do so, River City Ford filed bankruptcy and the dealership was closed.

I.
We first address the issues presented by Ford's cross-appeal. Ford contends that the plaintiffs' theories of liability were not supported by substantial evidence. They cite the plaintiffs' theory of the case, as summarized by the trial court in its instruction to the jury on the plaintiffs' claims and defenses:
"The plaintiffs claim that Don Kitchens, Dale Wendell and Bill Stang represented to the plaintiffs that the sales and profit forecast and capitalization requirements provided to the plaintiffs were reasonable and that the plaintiffs could rely on the numbers contained therein to make their decision to acquire the Selma Ford dealership.
The plaintiffs say that these representations were made with the intent to deceive them, based upon Ford Motor Company's knowledge of the substantial likelihood of failure of Ford black minority dealerships within the first two years.
The plaintiffs contend that under the facts of this case, Ford Motor Company was under a duty to disclose all material facts concerning the actual profitability performance of Ford's black minority dealers and the failure rates of such dealers, reflected on Ford Motor Company's own historical data collected with regard to Ford's black minority dealerships."
Our review of issues questioning the sufficiency of evidence begins with a presumption that a judgment based on a jury verdict is correct. King Motor Co., Inc. v. Wilson, 612 So.2d 1153 (Ala.1992); White v. Fridge, 461 So.2d 793, 794 (Ala.1984); Alpine Bay Resorts, Inc. v. Wyatt, 539 So.2d 160, 162 (Ala.1988). The strength of a jury verdict is based upon the right to a trial by jury. King Motor, supra. This court has noted the following regarding this presumption:
"Upon review of a jury verdict, we presume that the verdict was correct; we review the tendencies of the evidence most favorably to the prevailing party; and we *33 indulge such reasonable inferences as the jury was free to draw from the evidence. We will not overturn a jury verdict unless the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates the jury's verdict was wrong and unjust."
King Motor, at 1155 (citing Campbell v. Burns, 512 So.2d 1341, 1343 (Ala.1987)). Thus, this Court will not reverse this judgment, based on a jury verdict, on the ground that the evidence was insufficient unless the evidence, when viewed in a light most favorable to Dee-Witt Sperau and Samuel Foster, indicates that the verdict was "plainly and palpably wrong and unjust."
In an action for fraudulent misrepresentation, there must be a 1) misrepresentation of material fact 2) concerning a material existing fact, which was 3) relied on by the plaintiffs 4) to their detriment. § 6-5-101, Ala.Code 1975; Crowder v. Memory Hill Gardens, Inc., 516 So.2d 602 (Ala.1987). To support a claim alleging suppression of a material fact, the plaintiff must offer substantial evidence 1) that the defendant suppressed a material fact 2) that the defendant had a duty to communicate that material fact, either because of a confidential relationship between the parties, or because of the particular circumstances of the case, and 3) that the plaintiff suffered actual injury as a result of the suppression. § 6-5-102, Ala.Code 1975; Boswell v. Liberty Nat. Life Ins. Co., 643 So.2d 580 (Ala.1994); Interstate Truck Leasing, Inc. v. Bender, 608 So.2d 716 (Ala. 1992).
Ford argues that there is no evidence that it failed to disclose a material fact or suppressed a material fact. We disagree. The trial judge made the following finding in his Hammond order:
"There was evidence from which the jury could find, by a clear and convincing standard, that Ford defrauded the Plaintiffs by using sales and profit forecasts and capitalization requirements which were deceptive, based upon facts known to Ford. Other evidence provided, by a clear and convincing standard, a rational basis for the jury's punitive damages award. At the same time Ford management was aggressively recruiting black dealer candidates, including Samuel R. Foster, II, with sales and profit forecasts showing returns on investment of 65.4%, Ford management was telling its Board of Directors that it expected these same new black dealer candidates would be black loss dealers."
There is no dispute that the first profit and sales forecast provided by Ford to Foster and Sperau showed a projected return from the Selma dealership of 56%. The second, showed a 65.4% return. The first projected capital requirement was $632,000; the second was $535,000. The plaintiffs' expert, Dr. Charlie Carter, found the 65.4% return to be misleading. Even Ford's designated representative, Jim Ludlow, a Ford employee of 28 years described the change in the dealer investment to be "significant."
Robert Sullivan, a senior Ford executive who assisted in the preparation of the EOP Reports, admitted from the witness stand, as he read an excerpt from the 1987 EOP Report, that Ford knew that many African-American dealers would experience losses because of the marginal profits of newly appointed black dealers in Ford's aggressive black dealer appointment target:
"Q. Read that bottom paragraph to the jury, please.
"A. `Because of the marginal profitability of newly appointed dealers in our aggressive black dealer appointment target we will continue to have a high number of black loss dealers until they gain more retail experience.'
"Q. Was that true in November of 1987?
"A. Yes.
"Q. And did the management of Ford know that to be true?
"A. Yes.
"Q. That you had marginal profitability in newly appointed black dealers?
"A. Yes, it says marginal profitability of new appointed dealers.
"Q. Wasn't this referring to minority dealers?
"A. Yes, it is. Also is true for non-minority dealers."
*34 Ford argues that the representations made in this case were opinions, not representations of material fact. If there is proof of actual fraudulent intent at the time the representation is made, and the person succeeds in the deception and the injury results, an action for fraud may be predicated on such a representation, notwithstanding the opinion nature of the representation. Reynolds v. Mitchell, 529 So.2d 227, 231 (1988). The question of intent is a matter for the jury. Id. This Court has recognized that where the facts are not equally known to both parties, a statement of opinion by one who knows the facts better, often involves a statement of material fact that justifies the opinion, such that an action for fraud may be predicated upon the statement. Id. Whether a statement is an expression of an opinion or a statement of fact depends upon all the circumstances of the particular case and the question should be left to the jury. Joe Cooper & Associates, Inc., 614 So.2d 982 (Ala.1992); Boswell v. Coker, 519 So.2d 493 (Ala.1987).
In this case, there was substantial evidence from which the jury could conclude that Ford occupied a superior position with respect to historical information, as evidenced by the EOP Reports, which could predict future sales and profits. Additionally, Ford had established its own guidelines regarding initial capital requirements. The plaintiffs did not have this information at their disposal, and thus had to rely upon the statements made by representatives of Ford and Ford Motor Credit regarding the Selma dealership. The jury had substantial evidence before it concerning the aggressive recruitment of Foster and Ford's manipulation of the capitalization requirement and sales and profit forecasts.

II.
Ford argues that it had no duty to disclose "race-based" data and that such data was not material. The plaintiffs read the testimony of Robert Sullivan from the first trial of the case into the record. In it, Sullivan testified that if he were called upon to prepare a profit and sales forecast and/or capital requirement for a newly appointed African-American dealer, he would certainly take the fact that the dealer was a minority into consideration.
A duty to disclose arises if a confidential relationship exists between the parties or the particular circumstances of the case mandate disclosure. First Alabama Bank of Montgomery, N.A. v. First State Insurance Co., 899 F.2d 1045 (11th Cir. Ala. 1990). The factors to be considered are the trust or confidence between the parties, the value of the particular fact, the relative knowledge and bargaining position of the parties, and other circumstances surrounding the transaction. Jim Walter Homes, Inc. v. Waldrop, 448 So.2d 301 (Ala.1983). Furthermore, if the plaintiff is induced to take action that he otherwise would not have taken had there been full disclosure, the duty to disclose is more compelling. Baker v. Bennett, 603 So.2d 928, 935 (Ala.1992).
Ford argues that Sperau and Foster were educated, sophisticated businessmen and that no confidential relationship existed between the parties, or from the particular circumstances. However, a confidential relationship may arise in a commercial setting, because when a party makes a representation, he is under a duty to make a full and fair disclosure. First Alabama Bank, supra. Ford had superior and historical knowledge regarding the expected performance of its new dealers. Ford sought out Foster and aggressively recruited him as a dealer. Ford represented that a 65.4% sales and profit forecast was reasonable and reliable when Ford knew that new minority dealers, as well as non-minority dealers were predicted to be loss dealers. The evidence in this case supports Ford's duty to disclose.

III.
Ford also argues that the plaintiffs signed two documents which Ford claims preclude them from establishing justifiable reliance as a matter of law. First, Foster and Sperau signed the forecast of sales and profits itself which states:
"Forecast Sales and Profits are believed to be reasonable but cannot be guaranteed. *35 Actual results will depend on managerial ability and future business conditions."
Second, at closing, they signed an application for sales agreement which contained this language:
"I/we ... have determined to become an authorized dealer in [Ford] products and to make the investments necessary therefor, solely in reliance on my/our investigation and judgment of present and future conditions and expectations in my/our area and the industry and not in reliance on any statements made or documents exhibited to me/us by any representatives of Ford Motor Company, except for the following __None__ and such other statements or documents as may be specified by me/us in writing to Ford Motor Company prior to my/out execution and submission of [the] Sales Agreement."
In Downs v. Wallace, 622 So.2d 337 (Ala.1993) this Court considered whether an integration or merger clause made reliance on representation outside of the written agreement unjustifiable as a matter of law, as Ford contends they did in this case. In Downs, the purchasers of a feed and seed business brought an action against the broker and his corporation for fraud, alleging that the broker had induced them to purchase the business by misrepresenting and suppressing facts about the former ownership, the income, and the profitability of the business. The trial judge granted summary judgment for the broker; we reversed and remanded on the grounds that the presence of an integration clause did not render the purchasers' reliance on alleged oral misrepresentations unjustifiable or unreasonable as a matter of law. We said in Downs:
"Further, this Court has never held that an integration clause such as the one contained in the Downses' purchase agreement renders a party's reliance on oral representations unjustifiable, or unreasonable, as a matter of law. To the contrary, this Court has consistently held that although a written contract stipulates that there were no oral understandings not incorporated therein, such a stipulation does not foreclose a party, as a matter of law, from establishing his reliance on fraudulent representations that induced him to enter the contract." (Citations omitted.)
Id. at 341. In Downs, we quoted the reasoning of the Supreme Court of Massachusetts regarding the policy behind permitting a party to establish his reliance on another's fraudulent inducements, despite an integration clause in a written agreement:
"`In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement. To deny this possibility is to ignore the frequent instances in everyday experience where parties accept, often without critical examination, and act upon agreements containing somewhere within their four corners exculpatory clauses in one form or another, but where they do so, nevertheless, in reliance upon the honesty of supposed friends, the plausible and disarming statements of salesmen, or the customary course of business. To refuse relief would result in a multitude of frauds and in thwarting the general policy of the law.' Bates [v. Southgate], 308 Mass. 170, at 182, 31 N.E.2d 551, at 558 (1941)...."
Downs v. Wallace, supra at 341-342. See: Harris v. M & S Toyota, 575 So.2d 74 (Ala. 1991); Reynolds v. Mitchell, 529 So.2d 227 (Ala.1988).

IV.
Ford argues that there was no evidence that Sperau and Foster justifiably relied on the non-disclosure of the race-based data. However, Ford sought out Foster and aggressively recruited him as a dealer. Ford represented that a 65.4% sales and profit forecast was reasonable and reliable when it knew that new minority dealers were predicted to be loss dealers. There is ample evidence that Sperau and Foster relied upon the data provided to them by Ford, and that Ford did not disclose the race-based data, of which Ford had superior knowledge. The standard for justifiable reliance in a fraud case has been stated as follows:

*36 "Reliance should be assessed by the following standard: A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is `one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth.'"
Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92 (Ala.1989) (Hornsby, C.J., concurring specially) as quoted in Hickox v. Stover, 551 So.2d 259, 263 (Ala.1989). The question of whether Foster and Sperau justifiably relied on the projections was properly submitted to the jury. The record reflects, as the trial judge stated in his Hammond order:
There was evidence from which the jury could find, by a clear and convincing standard, that Ford Motor Company committed fraud against the Plaintiffs in inducing them to incur debt in excess of $1 million in order to acquire and operate a Ford dealership in Selma, Alabama."
The jury concluded that the Plaintiffs were induced to invest in the Selma dealership based on the fraudulent misrepresentations and suppressions of material facts committed by Ford and therefore damages were due to be awarded.

V.
Ford contends that the plaintiffs failed to establish that the failure of the dealership was the proximate result of the alleged misrepresentations and suppression of material fact. The company contends that the demise of the dealership was the result of severe mismanagement. Ford claims that Sperau and Foster drained capital out of the business by using the capital to pay a wide range of personal expenses, by taking higher salaries than Ford had projected, and by paying off Foster's tax liability from an unrelated business.
The plaintiffs counter that this argument is based on an erroneous characterization of the damages decided by the jury. The plaintiffs argue that the proper jury instruction was given as follows:
"Now in this case plaintiffs claim as compensatory damages, monies obtained from third parties and which monies are owed by them. The plaintiffs say these monies were borrowed to capitalize the Selma Ford dealership and were used in the business. In this regard, expenses incurred as a result of a fraudulent misrepresentation may be recovered. A party may recover all damages which were within the contemplation of the parties or which were necessary or natural and proximate consequences of the fraud."
Ford did not object to this instruction. It thus became the law of the case. Marshall Durbin Farms, Inc. v. Landers, 470 So.2d 1098, 1102 (Ala.1985).

VI.
Ford also claims that even if the plaintiffs have adduced sufficient evidence to support their misrepresentation and suppression claims, the theory upon which those claims rest, conflicts with federal law and is therefore preempted under the Supremacy Clause of the United States Constitution. Ford claims that an award of damages under state common law may be subject to conflict preemption if it effectively requires behavior that would be prohibited under federal law. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). Ford argues the plaintiffs' claims boil down to the contention that Ford should have inflated the capital requirement and concomitantly reduced the projected return on investment because Foster is an African-American. Ford contends that this verdict would require Ford to do precisely what 42 U.S.C. § 1981 prohibits, offer dealerships to black applicants on less favorable terms than are offered to white applicants.
We reject this contention, because it is premised upon an erroneous characterization of the verdict in this case as requiring a higher capitalization for a black dealership than a white dealership. The verdict in this case was based upon the plaintiffs' state action for fraud. The fraud claim is not preempted by federal law. In addition, Ford's preemption argument was never raised in the trial court, and thus has been *37 waived. Federal preemption must be affirmatively pleaded in order to avoid waiver. International Longshoremen's Ass'n v. Davis, 470 So.2d 1215 (Ala.1985).

VII.
Ford argues further that venue was not proper in Lowndes County, Alabama. In the original complaint, the plaintiffs alleged that the defendants Ford Motor Company and Ford Motor Credit Company were foreign corporations doing business in Lowndes County, Alabama, at all times material to the averments of the complaint which included a cause of action for breach of contract. Ford Motor and Ford Credit admitted that they were foreign corporations doing business within Lowndes County in their answer to the complaint. In the first trial of this case, the trial judge granted a directed verdict for the defendants as to the contract claim. Ford contends that once this occurred, there was no contract claim to which the other claims could be "joined" to preserve venue in Lowndes County for the second trial.
There is no merit to this argument, because the question of proper venue is to be determined as of the time the action is filed. Rule 82(b)(1)(A), A.R.Civ.P.; Ex parte Maness, 386 So.2d 429 (Ala.1980); Ex parte Wilson, 408 So.2d 94 (Ala.1981); Ex parte Smith, 423 So.2d 844 (Ala.1982); Elmore County Com'n v. Ragona, 540 So.2d 720 (Ala. 1989).

VIII.
Ford next argues that the trial court erred to reversal in admitting certain evidence by plaintiffs' economic expert, Dr. Charlie Carter. Ford specifically questions the evidence presented by Dr. Carter concerning the termination ratio for minority dealers, i.e. the percentage of black Ford dealers who went out of business. While admitting that Dr. Carter does appear to have taken the year-end numbers of minority-owned dealership directly from the EOP Reports, Ford states that Dr. Carter's figures on the number of dealers appointed each year are not in the report or other evidence introduced at the trial.
However, Ford did not preserve this issue by making a timely objection to the testimony. Macon County Com'n v. Sanders, 555 So.2d 1054, 1058 (Ala.1990); Mead Coated Board, Inc. v. Dempsey, [Ms. 1921827, April 29, 1994] 644 So.2d. 872 (Ala. 1994). The record reflects that counsel for Ford objected to Dr. Carter's testifying in a narrative fashion, however there was no objection to the content of his testimony. Instead, Ford conducted an extensive cross-examination of Dr. Carter and presented the testimony of Robert Sullivan, Ford's Manager of Dealer Operations for the Eastern United States, to refute the evidence Dr. Carter had presented. Ford offered into evidence a chart which was a replica of the diagram utilized in the examination of Robert Sullivan relating to Dr. Carter's figures. Four days after Dr. Carter had testified, Ford filed a hand written motion for mistrial or, in the alternative, to strike exhibit with instructions. The trial court responded to this motion by stating that the jury would be instructed concerning the weight, if any, to be given to the testimony of experts. The jury was properly instructed. Ford cannot now complain that Dr. Carter's testimony should have been excluded. Mead Coated Board, Inc. v. Dempsey, supra.

IX.
Finally, Ford contends that there was insufficient evidence to support the imposition of punitive damages, and that the award of punitive damages was excessive. Applying the principles of law this Court adopted in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986) and Green Oil Co. v. Hornsby, 539 So.2d 218, 223-224 (Ala.1989) and following the provisions of Section 6-11-23(b), Code of Ala.1975, the trial judge held a hearing, and issued a well-prepared order, stating the reasons why he concluded that the punitive damages awarded in this case were due to be imposed and were not excessive:
"The parties in this case were all represented by able counsel who represented their clients in a competent manner. The jury represented a fair cross section of the community based upon the factors of race, *38 age, and gender. During the course of deliberations, the jury requested additional instructions and deliberated several hours before reaching its verdicts in favor of the Plaintiffs and Ford Motor Credit Company. The jury was polled and each juror responded that the verdicts were their verdicts. The Court is satisfied that the jurors carried out their duties in a conscientious manner and that, except for the question of excessiveness of the mental anguish awards, the verdicts in this case were rendered by a properly functioning jury. There was no evidence before the Court of any misconduct, bias, passion, prejudice, corruption, or improper motive by the jury. The Court considers the fact that the jury returned a verdict of $635,000.00 in favor of Ford Motor Company's wholly owned subsidiary Ford Motor Credit Company, significant. It means the jury considered the law and evidence pertaining to all parties.
. . . . .
Punitive Damages
"Commencing on April 28, 1994 this Court conducted a hearing to consider the excessiveness of the $6 million punitive damages awarded in this case in accordance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); Green Oil Co. v. Hornsby, 539 So.2d 218, 223-224 (Ala. 1989); and the provisions of Section 6-11-23(b), Code of Alabama, 1975.

"This Court has determined that the punitive damage verdict rendered in this case is not due to bias, passion, prejudice, corruption, or other improper motive. Notwithstanding the fact that an award of punitive damages is made by a properly functioning jury, it may nevertheless be excessive if it exceeds the amount necessary to accomplish the purposes of punitive damages. The purpose of a punitive damage award is not to compensate the Plaintiffs but the focus is on punishing the wrongdoer and deterring others from committing similar wrongs in the future. Green Oil, supra, 539 So.2d at 222. Ford contends that the punitive damage award in this case exceeds the amount necessary to accomplish these purposes.
"The issue to be decided, then, is whether under the facts of this case the punitive damage award of $6 million exceeds an amount that will punish the defendant and deter the Defendant and others from committing similar wrongs in the future. The constitutional protection of the jury's award of punitive damages may only be disturbed if it is so excessive or out of proportion to the wrong committed by the Defendant as to violate the Defendant's rights not to be deprived of property without due process of law. Henderson v. Alabama Power Company, 627 So.2d 878, 893 (Ala.1993).
"The Alabama Supreme Court and the Legislature have identified several non-exclusive factors which this Court may consider bearing on the question of the excessiveness of a punitive damages award. In considering these factors it is the decision of this Court that a punitive damages award of $6 million in this case is not excessive. In making its decision this Court has considered each of the numerous factors suggested by the Alabama Supreme Court in its decisions and the Alabama Legislature in its statute. The Court has also considered the United States Supreme Court's recent decisions in Haslip and TXO considering pertinent factors. In accordance with the procedure established in Hammond, the reasons for declining to disturb the jury's punitive damage award are stated hereinafter.
"There was evidence from which the jury could find, by a clear and convincing standard, that Ford Motor Company committed fraud against the Plaintiffs in inducing them to incur debt in excess of $1 million in order to acquire and operate a Ford dealership in Selma, Alabama. Accordingly, this Court finds that the actual harm suffered by the Plaintiffs due to the Defendants' fraudulent conduct and its duration supports the jury's punitive damages award in this case.
"There was also evidence from which the jury could determine, by a clear and convincing standard, that the deception of the Plaintiffs was committed with Ford's knowledge of the financial condition of the *39 Plaintiffs, their degree of experience, the profitability and loss experience of black dealers participating in the Minority Dealer Program under circumstances similar to the Plaintiffs, and the economic impact the failure of the dealership would have on the Plaintiffs. Having considered the evidence bearing on the issue of the intentional misconduct engaged in by Ford with regard to the Plaintiffs, this Court finds that such evidence supports the amount of punitive damages awarded by the jury.
"This Court has considered the issue of the impact of the punitive damages verdict on innocent third parties. Ford emphasizes its good intentions in recruiting black dealer candidates to participate in its Minority Dealer Program. Ford suggests that the punitive damages verdict in this case will have a detrimental effect on this Program and those participating now in the Program and those candidates who would participate in the Program in the future. During the Hammond hearing, this Court heard testimony from the Ford executive responsible for the Minority Dealer Program that to provide negative information to black dealer candidates would discourage their participation in Ford's Program.
"There was evidence from which the jury could find, by a clear and convincing standard, that Ford defrauded the Plaintiffs by using sales and profit forecasts and capitalization requirements which were deceptive based upon facts known to Ford. Other evidence provided, by a clear and convincing standard, a rational basis for the jury's punitive damages award. At the same time Ford management was aggressively recruiting black dealer candidates, including Samuel R. Foster, II, with sales and profit forecasts showing returns on investment of 65.4%, Ford management was telling its Board of Directors that it expected these same new black dealer candidates would be black loss dealers.
"Although a Program designed to give black dealer candidates the opportunity to acquire an automobile dealership may be a laudable objective, the end of meeting an extremely aggressive black dealer count does not justify the perpetration of an intentional fraud. This Court is also not persuaded that Ford's only alternative to suits of this nature is to stop its minority program. Disclosure of the failure rate of "all" new dealers along with a disclosure of the cyclical nature of the business would certainly be a start toward correcting the problems complained of here.
"Another of the factors to be considered is whether the Defendant profited or received a benefit from its misconduct. Ford derived a substantial benefit from its recruitment of black dealer candidates including the Plaintiffs. Ford management stated in the October, 1987 Equal Opportunity Progress Report that i[t]s black dealerships had sales of Ford products amounting to $1 billion. The corporate benefit of the black dealer body in dollars to Ford is significant. The Plaintiffs point out that River City Ford sold approximately $15 million in Ford products. They also maintain that the black dealer program provided Ford the added benefits of positive corporate image and a means of keeping dealerships in less desirable geographic locations in business.
"Ford's 1993 Form 10-K indicates that Ford Motor Company had an annual net income of approximately $2.5 billion for 1993 and assets approaching $200 billion. Additionally, Ford management testified during the Hammond hearing that the $6 million punitive damages award will have no effect on Ford's continued operation. This Court also notes that the United States Supreme Court affirmed a punitive damages award of a West Virginia jury in the amount of $10 million against TXO. In TXO the Plaintiff estimated that TXO had a net worth of between $2.2 billion and $2.5 billion, a net worth equivalent to Ford Motor Company's net income for 1993. TXO Production v. Alliance Resources, 509 U.S. 443, 450 n. 9, 113 S.Ct. 2711, 2716 n. 9, 125 L.Ed.2d 366, 374 n. 9 (1993).
"A $6 million punitive damages verdict against Ford Motor Company is not excessive under the facts of this case, given the financial position of Ford Motor Company. This is particularly so when the $6 million punitive damage award in this case is compared *40 to larger punitive damages awards affirmed by the Alabama Supreme Court in similar fraud cases against corporate defendants which do not have either the assets or income of Ford Motor Company.
"Another factor considered in sustaining the jury's punitive damages award in the Plaintiffs' costs of litigation. Plaintiffs expended considerable resources in time and money to prepare and try this case. A reduction of the jury's punitive damages award in this case would discourage plaintiffs undertaking such litigation due to the substantial costs required."
We adopt the well reasoned Hammond Order of the trial judge as our own. The trial judge has weighed the factors previously set forth by this Court and by the Alabama legislature and has determined that a punitive damages award of $6 million in this case is not excessive. In addition, at the Hammond hearing, the plaintiffs presented Ford's Form 10-K filed with the Securities and Exchange Commission for the year ending December 21, 1993, as evidence of the economic impact of the verdict on Ford. The Ford Form 10-K shows that for the year ending 1993, Ford Motor Company had total assets of $198 billion, and the automobile division of Ford realized a net income of $940 million. The presumption of correctness of a jury verdict, extends to the jury's punitive damage award. Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala.1991).

X.
We now consider the plaintiffs' appeal in this case. First, the plaintiffs aver that the trial court erred in directing a verdict in favor of Ford Motor Credit Company and Ford Motor Company on the plaintiffs' contract claim. Ford contends that the plaintiffs cannot raise this issue as to Ford Motor Company, because their notice of appeal from the directed verdict names only "FMCC" or Ford Motor Credit Company. We agree. It is settled law that notice of appeal from a judgment in favor of two or more parties must specifically name each party whose judgment the appellant wishes to overturn. Rule 3(c), A.R.App.P.; Edmondson v. Blakey, 341 So.2d 481 (Ala. 1976); Threadgill v. Birmingham Board of Education, 407 So.2d 129, 132 (Ala.1981) quoting C.A. May Marine Supply Co. v. Brunswick Corp., 649 F.2d 1049, 1056 (5th Cir.1981), cert. denied, 454 U.S. 1125, 102 S.Ct. 974, 71 L.Ed.2d 112 (1981).

XI.
Next, we consider the claims of plaintiffs Chandra Foster and Diane Sperau, the wives of Sam Foster II and Dee-Witt Sperau. The wives claim that, as a result of Ford's misrepresentations, they signed personal guaranties for the capital loan and the floor plan funds extended by Ford Credit. The wives appeal from the entry of summary judgment in favor of Ford Motor Company and Ford Motor Credit on their claims. The record reflects that the trial judge submitted Ford Credit's counterclaim on its guaranties to the jury, instructing it as follows:
"If you are reasonably satisfied from the evidence that Dee-Witt Sperau, Diane Sperau and Samuel R. Foster, II, were induced by fraud, as defined to you by the court, to enter into the promissory notes and guarantees made the basis of Ford Motor Credit Company's counterclaim and that they were damaged or will suffer damage in the future therefrom, then Dee-Witt Sperau, Diane Sperau and Samuel R. Foster are not liable on the counterclaim and you should so find."
The jury rendered a verdict in favor of Ford Credit on its counterclaim and assessed damages in the amount of $635,000.00, thus necessarily finding that Ford Credit had not committed fraud on either the husbands or the wives with respect to the guaranties. Thus, the verdict is res judicata as to these claims.[5]Turner v. Green, 571 So.2d 1104, 1106 (Ala.1990).

XII.
Finally, we consider Foster and Sperau's cross-appeal contending that the trial court erred in granting a remittitur of the jury's award to them for mental anguish. In his order of June 19, 1994, the trial judge granted a remittitur of Sperau's mental anguish *41 award from $1 million to $200,000 and of Foster's mental anguish award from $2.5 million to $500,000, stating as follows:
"The jury awarded damages for mental anguish to Samuel R. Foster, II, in the amount of $2,500,000.00. The jury returned a verdict awarding damages for mental anguish in favor of Dee-Witt C. Sperau in the amount of $1,000,000.00. The jury heard testimony of the Plaintiffs, Plaintiffs' wives, and Plaintiff Foster's father which related to the Plaintiff's humiliation, shame and wounded pride. There was some additional evidence before the jury from which it could be inferred that Plaintiff Foster's humiliation and shame would be greater than Plaintiff Sperau's because of his reputation, and because of additional family relationships being affected. Neither Plaintiff presented evidence of any need for counseling or mental health care or that either Plaintiff was unable to cope with the stress and grief resulting from their situation. No evidence was presented from any expert or healthcare professional that either Plaintiff was suffering from a serious emotional disorder as a result of their experiences.
"Plaintiffs wish to rely on the fact that substantial amounts of monies were involved which justify the enormous award for mental anguish. This court does not believe the amount of money involved is the guiding factor in determining the amount of mental anguish, rather the feelings and mental condition of the Plaintiff should be [a] guiding factor. Indeed, the loss of a single weekly or monthly paycheck to a person of insubstantial means may cause as much mental anguish as a multi-million dollar loss would to one of substantial means. Also, a person of substantial means, with a good education, and with broad business experience may be better able to handle the frustration than one who was not so educated and experienced. This Court also notes that there were other factors in evidence which could have exerted a certain amount of mental suffering on these Plaintiffs which was unrelated to the actions of the Defendants.
"These Plaintiffs filed suit three months after River City Ford closed its doors and in view of the scant evidence of mental anguish or suffering by both Plaintiffs, the award totalling $3.5 million for mental anguish are excessive and should be remitted. This court considers that a remittitur of excessive damages for mental anguish by this court is warranted and justified by similar action taken by the Supreme Court of Alabama on compensatory damage awards involving mental anguish in the cases of Sears, Roebuck and Co. v. Harris, 630 So.2d 1018, 1034 (Ala.1993) and Foster v. Life Insurance Co., 656 So.2d 333 (Ala. 1994).
"In short, the Court is shocked by the size of the verdicts for mental anguish in view of the evidence presented at trial. This Court considers $100,000.00 would be adequate for Sperau and $250,000.00 would be adequate for Foster. However, the Court considers that a properly functioning jury could have awarded a maximum of $200,000.00 for mental anguish to Plaintiff Sperau and a maximum of $500,000.00 for mental anguish to Plaintiff Foster...."
This Court has said that the trial court has much discretion in determining whether to grant a new trial and to require a remittitur of damages for mental anguish. Crown Life Ins. Co. v. Smith, 657 So.2d 821 (Ala.1994):
"The trial court has much discretion in determining whether to grant a new trial and, in that regard, whether to require a remittitur. Fields v. Parker, 361 So.2d 356 (Ala.1978). Given that discretion, the trial court's ruling on a new trial motion is presumed to be correct. Todd v. United Steelworkers of America, 441 So.2d 889 (Ala.1983); Birmingham Electric Co. v. Thompson, 251 Ala. 465, 37 So.2d 633 (1948)."
Id. While recognizing that "there is [no] yardstick to measure the amount of recompense which should be awarded for ... mental suffering," Birmingham Elec. Co., 251 Ala. at 466, 37 So.2d at 634, the trial judge has carefully reviewed the evidence presented by the plaintiffs concerning their claim for mental anguish. We find no abuse of discretion on his part in remitting these two *42 awards for mental anguish, based upon the evidence before him.
Based on the foregoing, we are of the opinion that the judgment of the trial court, including the damages award, and the remittitur of the damages for mental anguish, is due to be, and it hereby is, affirmed.
AFFIRMED.
ALMON, SHORES, KENNEDY, INGRAM, COOK, and BUTTS, JJ., concur.
MADDOX and HOUSTON, JJ., dissent.
HOUSTON, Justice (dissenting).
I am concerned about the effect the tort theories advanced by these plaintiffs may have on the vision of this nation. Those theories are (1) that a person's being a member of a racial minority impairs that person's ability to compete, and (2) that businesses that offer members of minorities the opportunity to compete, without disclosing that alleged racial handicap, can be liable for compensatory and punitive damages if one of the members accepts that opportunity and then fails.
I am concerned because I do not believe that a person's race impairs his or her ability to compete, and because I believe that to base tort liability on the false premise that it does is to "attempt the Future's portal with the Past's blood rusted key."[1]
Mel Farr, chairman of the Ford Lincoln-Mercury Black Dealers Association, testified in this case, expressing the opinion that qualified minority applicants should have "an opportunity to participate in the ... free enterprise system that says you have the right to fail and you have the right to succeed." Farr further testified that, in his opinion, it is insulting to suggest that race has anything to do with that success or failure in a business venture.
There are tens of thousands of franchised new car dealerships in this country that generate billions of dollars in annual sales. The automobile industry, through its franchises, is a major source of small business opportunities in this country. I am concerned that the jury verdict in this case could have a significant negative impact on this country's efforts to make "equal opportunity" a reality of the American economy.
However, this is a dissenting opinion; and there was evidence that certain Ford employees represented to the plaintiffs that sales and profit forecasts for the existing Selma Ford dealership that the plaintiffs had purchased were reasonable, and there was evidence that those employees suppressed or misrepresented the capitalization requirements needed to acquire and successfully operate the existing dealership (Rodopoulos v. Sam Piki Enterprises, Inc., 570 So.2d 661 (Ala.1990)). Therefore, without further discussion of whether the defendant had any initial legal liability based upon the theories expressed in the first paragraph of this dissent, I address the issue of punitive damages. In Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), a majority of this Court held that the legislation that imposed a $250,000 cap on punitive damages (Ala.Code 1975, § 6-11-21) violated the right to trial by jury guaranteed by § 11 of the Constitution of Alabama of 1901. In my dissent, I wrote:
"However, if the trial court is the trier of the facts, then punitive damages cannot exceed $250,000 unless the punitive damages award is based on one of the three exceptions listed in [Ala.Code 1975,] § 6-11-21, because clearly what the trial court does as trier of the facts is in no way affected by § 11 of the Constitution....
"The people spoke through their legislature in 1987. The people spoke after all sides had been heard. The best and the brightest advocated or opposed a fixed limitation on punitive damages. What is now § 6-11-21 was legally adopted by a duly elected legislature, and it was approved by a duly elected governor. This was representative democracy at work. If excessiveness of a punitive damages award is raised, should not I, as an appellate court judge, treat $250,000 as the outer limit of what society deems necessary in the way of punishment and deterrence for civil wrongs (except those for which the limit was not made applicable). As the author *43 of Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), I believe that a $250,000 limitation should be factored into the Green Oil Co. standard of review. The legislature can by general act change rules adopted by this Court. Section 6.11, of Amendment 328, Alabama Constitution."
627 So.2d at 914.
Subsequently, the United States Supreme Court in Honda Motor Co. v. Oberg, ___ U.S. ___, ___, 114 S.Ct. 2331, 2342, 129 L.Ed.2d 336 (1994), held: "A decision to punish a tortfeasor by means of an exaction of exemplary damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment." Oberg further provided: "`"[P]rocedural due process" requires judicial review of punitive damages awards for reasonableness....'" ___ U.S. at ___, 114 S.Ct. at 2335, quoting TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). The Supreme Court in Oberg held, in effect, that a 1910 amendment to the Oregon Constitution, which prohibited judicial review of the amount of punitive damages awarded by a jury unless the Court could affirmatively say there was no evidence to support the verdict, violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution.
Who sets the outer limit of reasonableness of a punitive damages award? For cases such as the case before us there is a legislative pronouncement that "[a]n award of punitive damages shall not exceed $250,000." See § 6-11-21. When the legislature has set a maximum on the amount of punitive damages that may be imposed upon a defendant in a case, can the judiciary, in accordance with the Due Process Clause of the Fourteenth Amendment, ignore that legislative mandate? Can the judiciary, in accordance with the Equal Protection Clause of the Fourteenth Amendment, enforce $250,000 as the outer limit of reasonableness in regard to punitive damages awarded by a trial judge in a case tried without a jury, but ignore that outer limit of reasonableness in its review of jury verdicts? If the judiciary does ignore that outer limit of reasonableness in its review of jury verdicts, would this not subject § 11 of the Alabama Constitution to a constitutional challenge under the due process and equal protection provisions of the Fourteenth Amendment of the United States Constitution?
It is the basic function of the legislature to establish this state's public policy. See Almon v. Morgan County, 245 Ala. 241, 245, 16 So.2d 511, 514 (1944) ("the Legislature prescribes the State's policy; the courts do not"). See, also, Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9-10, 18 So.2d 810, 815 (1944), cert. dismissed, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945).
Historically the power to punish for criminal behavior in this country has rested in elected legislative bodies.
"The power to prescribe the penalty to be imposed for [the] commission of a crime rests with the legislature, not with the courts. This power is not a special grant or limited authority; it is part of the sovereign power of the state to maintain social order and to take life and liberty and the rights of both when necessary. As the Supreme Court has stated, whatever views may be entertained regarding the severity of punishment, whether one believes in its efficacy or its futility, these are peculiarly questions of legislative policy.
"The power of a legislative body with respect to punishment for crime is practically unlimited, and is controlled only by constitutional provisions. Subject to this qualification, the legislature may fix the punishment for crime as it sees fit, and where a particular punishment is prescribed, no other may be imposed."
21 Am.Jur.2d Criminal Law § 589 (1981). See, also, Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); Jones v. Thomas, 491 U.S. 376, 109 S.Ct. 2522, 105 L.Ed.2d 322 (1989). In Alabama, the legislature sets the punishment for criminal offenses. See Ala.Code 1975, §§ 13A-5-6, -7, -9, -11, -12, -13, and -39 et seq.; see, also, Ex parte Giles, 632 So.2d 577 (Ala.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994). In fulfilling this function, *44 in accordance with Article I, § 35, of the Alabama Constitution of 1901, the legislature determines the extent to which the state can be allowed to deprive a person convicted of a criminal offense of his or her property, including a person convicted of the most egregious criminal act. By way of example, a person convicted of a class A felony, such as murder under § 13A-6-2, may be fined an amount not exceeding $20,000, or "[a]ny amount not exceeding double the pecuniary gain to the defendant or loss to the victim caused by the commission of the offense." Section 13A-5-12(a)(1) and (a)(4). In Alabama, juries imposed fines and fixed sentences at the time of the ratification of the Constitution of Alabama of 1901. If a jury imposed a fine in excess of the legislatively prescribed maximum fine, would this not have been a violation of the Due Process Clause of the Fourteenth Amendment? Subsequent to the ratification of the Constitution of 1901, the legislature removed from the jury the right to impose fines and to fix sentences and empowered the trial court to do so. If a trial court were to impose in a criminal case a fine in excess of that prescribed in the Code sections cited above, would this not violate the due process provision of the Fourteenth Amendment? If an appellate court should affirm a judgment imposing such a fine, would that not violate the due process provision of the Fourteenth Amendment?
"A decision to punish a tortfeasor by means of an exaction of exemplary damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment." Oberg, ___ U.S. at ___, 114 S.Ct. at 2342. (Emphasis added.) In fulfilling its policy-making role on the civil side of the law, the legislature has determined that $250,000 is the maximum "reasonable" amount of punitive damages that should be awarded in fraud cases, such as the present one, where no pattern or practice of wrongful conduct has been shown. § 6-11-21. A majority of this Court in Henderson, supra, held that § 6-11-21 violated Article I, § 11, of the Alabama Constitution of 1901, to the extent that it set a limit on the amount of punitive damages that could be awarded by a jury in a particular case. I am aware of no decision from this Court holding that the expression of policy set out by the legislature in § 6-11-21 violates the separation of powers provision of the Alabama Constitution of 1901, Article III, § 43.[2] Therefore, in cases where the trial court acts as the factfinder, punitive damages cannot exceed $250,000, unless the punitive damages award is based on one of the three exceptions listed in § 6-11-21, because clearly what the trial court does as a factfinder is in no way affected by § 11 of the Alabama Constitution. Thus, the $250,000 statutory limit is no less a viable expression of this state's public policy following Henderson. This Court, in its exercise of supervisory appellate jurisdiction over jury verdicts, is bound by the Fourteenth Amendment and Article VI (the Supremacy Clause) of the United States Constitution to conduct a "meaningful" review of jury verdicts awarding punitive damages. This Court simply cannot fulfill this constitutionally mandated responsibility without recognizing that the legislature, exercising its policy-making power, has determined that $250,000 is the maximum reasonable amount of punitive damages that should be awarded in fraud cases like this one.
From my perspective as an Associate Justice of the Supreme Court of Alabama, and after struggling many years to bring some "rhyme or reason" to the process by which punitive damages awards are reviewed on appeal, I have concluded that it is a violation of the Fourteenth Amendment for this Court, in attempting to fulfill its constitutionally mandated responsibility of conducting a meaningful review of punitive damages awards, to ignore the public policy of this state expressed in § 6-11-21, and to affirm an award of punitive damages in excess of $250,000, when none of the exceptions listed in § 6-11-21 applies. Justice Hugo Black, writing for a majority of the Court in Giaccio v. Pennsylvania, 382 U.S. 399, 403, 86 S.Ct. 518, 521, 15 L.Ed.2d 447 (1966), noted that *45 "one of the basic purposes of the Due Process Clause has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land." In my view, the majority's decision here is no less objectionable under the Fourteenth Amendment than would be a decision from this Court, or from the Court of Criminal Appeals, upholding punishment in a criminal case in excess of the legislatively prescribed punishment for the offense charged. See Hicks v. Oklahoma, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980).
Time and again this Court has held that a plaintiff has no right to punitive damages. See, e.g., Meighan v. Birmingham Terminal Co., 165 Ala. 591, 51 So. 775 (1910); Comer v. Age-Herald Publishing Co., 151 Ala. 613, 44 So. 673 (1907). Therefore, in addressing punitive damages, "the sole object and only legitimate end of [both the legislative and judicial departments of] government is to protect" the property interests of civil defendants in cases where punitive damages are sought; and when the judicial department ignores legislative policy with respect to the outer limit of punitive damages that can be awarded in tort cases, it has exceeded the "sole object and only legitimate end of government," and, in accordance with Article I, § 35, of the Constitution, it has engaged in "usurpation and oppression."
For the foregoing reasons, I respectfully dissent from that portion of the majority opinion affirming the jury's award of punitive damages in the amount of $6,000,000. I would remit the punitive damages award to $250,000, in accordance with the established policy of this state.
MADDOX, J., concurs.
NOTES
[1] Ford Credit's Branch Manager in Dothan, Alabama.
[2] Plaintiffs' Motion in Limine; Defendants' Motion in Limine; Motion for Sequestered Voir Dire, Motion for Summary Judgment, and Motion for Partial Summary Judgment.
[3] The hearing was held in accordance with guidelines set out in Hammond v. City of Gadsden, 493 So.2d 1374 (Al.1986); Harmon v. Motors Insurance Corp., 493 So.2d 1370 (Ala.1986); and Alabama Farm Bureau Mutual Cas. Ins. Co. v. Griffin, 493 So.2d 1379 (Ala.1986).
[4] Foster and Sperau received $19,800 in launch costs and $44,116.52 in supplemental parts return.
[5] Ford Credit Company released Chandra Foster from the guaranty.
[1] James Russell Lowell, The Present Crisis.
[2] By mentioning this, I do not mean to suggest that § 6-11-21 in any way violates Article III, § 43, of the Constitution.