708 So.2d 111 (1997)
FORD MOTOR COMPANY
v.
Dee-Witt SPERAU and Samuel R. Foster II.
1931591.
Supreme Court of Alabama.
September 5, 1997.
Rehearing Denied January 23, 1998.
*113 Tabor R. Novak, Jr., and Clyde C. Owen, Jr., of Ball, Ball, Matthews & Novak, P.A., Montgomery; C.C. Torbert, Jr., of Maynard, Cooper & Gale, Montgomery; and Andrew L. Frey and Evan M. Tager of Mayer, Brown & Platt, Washington, DC, for Ford Motor Co.
Maston E. Martin, Jr., of Fazekas & Martin, Montgomery; John A. Taber, Fairhope; Lee H. Copeland of Copeland, Franco, Screws & Gill, Montgomery; and H. Lewis Gillis of Thomas, Means & Gillis, Montgomery, for Sperau et al.

On Remand from the Supreme Court of the United States
PER CURIAM.
This case is on remand from the Supreme Court of the United States. The question before us is whether the $6 million punitive damages award assessed against Ford Motor Company is excessive under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, in light of the guidelines established by the Supreme Court of the United States in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).
The facts of this case are set forth in detail in our original opinion, Sperau v. Ford Motor Co., 674 So.2d 24 (Ala.1995). We note them here briefly: In the period 1987-1988, employees of the defendant Ford Motor Company ("Ford") sought to convince the plaintiff Samuel R. Foster II, who is African-American, to purchase a Ford automobile dealership in Selma, Alabama. Ford viewed Foster as an attractive candidate for Ford's Minority Dealer Program, a voluntary affirmative action policy established to increase the number of minority Ford dealers. At that time, Foster owned and operated a commercial construction business in Charlotte, North Carolina, but had no experience in the automobile industry. Because of his inexperience, Foster took on the plaintiff Dee-Witt C. Sperau, who is white, as a partner in seeking to acquire a Ford dealership. Sperau was then an employee of Foster's company; he assisted in obtaining construction bonds for that company. Sperau had had some bookkeeping experience at three Ford dealerships between 1968 and 1971, but had not been involved in the automotive industry since then.
In connection with the prospective purchase of the Selma dealership, Ford representatives presented to Foster and Sperau a "sales and profit forecast" that had been prepared on the dealership. This initial sales and profit forecast indicated that Foster and Sperau would have to make a capital investment of $632,000 to run the dealership, and it projected profits of $292,000 and $358,000 in the first two years of operation, which translated to returns on investment of 46.2% and 56.6%, respectively. After visiting the dealership, Foster and Sperau decided not to invest. Ford's Atlanta District market representation manager, Don Kitchens, then prepared a second sales and profit forecast on the Selma dealership and presented it to Foster. The revised forecast, which was made with the plaintiffs specifically in mind, reduced the required investment to $535,000 and listed as reasonable expected profits of $274,000 and $350,000, returns on investment of 51.2% and 65.4%.
Relying upon the revised forecast, Foster and Sperau ultimately decided to purchase the dealership, which they operated under the name "River City Ford." Unfortunately, the forecast profits failed to materialize. The plaintiffs began operating the River City Ford dealership in May 1988. For the remainder of 1988, the dealership did record a profit of approximately $103,000. But in 1989 and 1990, the dealership posted net losses of roughly $4,000 and $6,000, respectively. Finally, River City Ford filed a bankruptcy petition, and the dealership closed in January 1991.
Soon after that collapse, Foster and Sperau filed this action against Ford; Ford Motor Credit Company ("Ford Credit"), which is Ford's wholly owned subsidiary financing corporation; and a Ford Credit employee. Foster and Sperau claimed, among other *114 things, that, in an effort to induce them to purchase the Selma dealership, Ford had committed intentional misrepresentations and fraudulent suppression. The plaintiffs alleged that through the monitoring of its Minority Dealer Program, in which Foster's dealership was a participant, Ford was aware that its minority dealers did not perform as well as the average Ford dealer and that its minority dealers experienced smaller average returns on investment and were more likely to lose money each year. Reports to Ford's board of directors show that for the years 1984 through 1987, the four years preceding the sale of the Selma dealership to the plaintiffs, the Ford dealer body experienced yearly returns on investment of 53%, 44%, 42%, and 45%, compared with returns for minority dealers over the same period of 25%, 20%, 16%, and 27%. Similarly, for 1985 through 1987, the percentage of Ford dealerships reporting a yearly net loss was 16%, 16%, and 9%, while for black dealers the percentages for the same years were 34%, 39%, and 23%. Ford was also aware that prospects were even worse for newly appointed dealers, both black and white. Fifty-eight percent of minority Ford dealers who had been in business for one year or less were in a loss position for the year-to-date as of July 1986, while 22% of white dealers with similar experience posted losses for that year-to-date period. Conversely, only 15% of white Ford dealers in business for more than one year were in a loss position for that same year-to-date period, although 26% of minority owners, even among this experienced group, posted losses.
Ford's reports also recognized that minority dealers often possessed certain characteristics that Ford believed accounted for the lower achievement, such as "considerably less retail management experience, ... a typically high initial turnover of people, ... higher fixed costs, and ... difficulty in attracting qualified management personnel." The reports repeatedly noted that many minority dealerships were in the early stages of development and were still encountering start-up costs in the "difficult launch period" and that all the more profitable dealers had been in business over two years and were the most experienced. Finally, the 1987 report, the last report prepared before the plaintiffs purchased the dealership, also displays that Ford was aware that more "black loss dealers" could be expected in the immediate future, predicting: "Because of the marginal profitability of newly appointed dealers, and our aggressive black dealer appointment target, we will continue to have a high number of black loss dealers until they have gained more retail experience."
Foster and Sperau contended that because the Selma dealership would be a minority owned dealership, Ford's estimates of potential profits and of the amount of capital required were intentionally misleading, given the information in Ford's possession. The plaintiffs' fraudulent suppression claim stemmed from Ford's failure to disclose to them the information on the past performance of minority dealers. At trial, Ford denied that it had a duty to reveal the information concerning the average performance of black-owned dealerships and denied that that information was material to the plaintiffs' decision to purchase the dealership. Ford further claimed that its forecast projections were reasonable and that River City Ford's failure was proximately caused by severe mismanagement on the part of the plaintiffs. Ford Credit counterclaimed against Foster and Sperau, as guarantors, for debts owed to it by the dealership.
The jury's verdict awarded Foster and Sperau $992,000 in damages for economic losses relating to debts they had incurred to purchase and operate River City Ford, and awarded $635,000 to Ford Credit on its counterclaim against the plaintiffs for loans Ford Credit had made to the dealership. The jury found that Foster and Sperau were entitled to damages in the amounts of $2.5 and $1 million, respectively, as compensation for mental anguish. And finally, the jury assessed punitive damages of $6 million against Ford for its fraudulent conduct. After Ford had filed numerous post-trial motions, the trial court conducted a hearing pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and § 6-11-23(b), Ala.Code 1975. The trial court determined that Foster and Sperau's respective awards *115 for mental anguish should be reduced to $500,000 and $200,000, but concluded that the $6 million punitive damages award was justified. On appeal, this Court affirmed the judgment of the trial court in its entirety, specifically holding that the $6 million punitive damages award was not excessive. Ford petitioned to the Supreme Court of the United States for certiorari review. In a memorandum, Ford Motor Co. v. Sperau, 517 U.S. 1217, 116 S.Ct. 1843, 134 L.Ed.2d 945 (1996), the Supreme Court granted certiorari review, vacated our judgment, and remanded the case for further consideration in light of its decision in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). On remand, we again affirm the judgment of the trial court, conditioned upon the plaintiffs' filing in this Court a remittitur reducing the punitive damages award to the sum of $1,792,000.
In its 5-4 decision reversing the judgment of this Court in BMW, supra, the Supreme Court of the United States concluded, for the first time, that the amount of a punitive damages award rendered it violative of the Due Process Clause of the Fourteenth Amendment, notwithstanding that the punitive award was the product of procedures that had previously passed constitutional muster. BMW, 517 U.S. at 573-74, 116 S.Ct. at 1598; see Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The Supreme Court stated that, under the Due Process Clause, a defendant has the right to "fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose" for such conduct. BMW, 517 U.S. at 574, 116 S.Ct. at 1598. The Court recognized that "[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." Id., 517 U.S. at 568, 116 S.Ct. at 1595 (citations omitted). "Only when an award can fairly be categorized as `grossly excessive' in relation to these interests," the Court continued, "does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." Id. (citation omitted). In order to help reviewing courts better identify punitive damages awards that cross the line into constitutional impropriety, the Supreme Court identified the following three "guideposts": (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the amount of actual or potential harm suffered by the plaintiff, and (3) a comparison of the amount of the punitive damages award with civil or criminal penalties authorized or imposed in comparable cases. Id., 517 U.S. at 573-76, 116 S.Ct. at 1598-99.
In this Court's opinion on remand, BMW of North America, Inc. v. Gore ("BMW II"), 701 So.2d 507 (Ala.1997), this Court pointed out that the United States Supreme Court majority did not dismiss the review process already established by this Court in Hammond and Green Oil, supra, and upheld as constitutional in Haslip, supra. BMW II, 701 So.2d at 509. Indeed, we recognized that the first two "guideposts" set out by the United States Supreme Court, the degree of reprehensibility of the defendant's conduct and the ratio of the punitive award to actual or potential harm suffered by the plaintiff, are already encompassed within the Hammond-Green Oil review. Id. Thus, rather than supplanting our established review procedures,
"[we saw] the three guideposts as factors to be emphasized in a judicial review of a punitive damages award pursuant to Hammond, Green Oil, and Ala.Code 1975, § 6-11-23(b). In sum, the United States Supreme Court's BMW decision seems to hold that the presumption of validity Alabama extends to a jury verdict must yield to a more meaningful judicial review of that verdict when it is challenged by a tortfeasor as excessive."
Id. at 510.
Accordingly, in this case, we comply with the Supreme Court's mandate to reconsider the excessiveness question, by employing the factors enumerated in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), as we view them now in light of the Supreme Court's decision in BMW. However, before reexamining the question of excessiveness of the award, we note that Ford also contends that the imposition upon it of any punitive *116 damages violates the Due Process Clause of the Fourteenth Amendment. We conclude that this argument is without merit.
The evidence in this case would have permitted the jury to find, by a clear and convincing standard, that Ford "consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff[s]," § 6-11-20(a), Ala. Code 1975, by intending to deceive and mislead them by overestimating the true profit potential of the dealership and underestimating the amount of capital required to run it, in order to increase Ford's minority dealer count. It has been the rule in Alabama that upon a finding of an intent to deceive or defraud, punitive damages may be awarded. German Auto, Inc. v. Tamburello, 565 So.2d 238, 240 (Ala.1990). See also Carnival Cruise Lines, Inc. v. Goodin, 535 So.2d 98 (Ala.1988); American Honda Motor Co. v. Boyd, 475 So.2d 835 (Ala.1985); Ex parte Lewis, 416 So.2d 410 (Ala.1982) (Jones, J., concurring specially).[1] For, as this Court has stated, "Once an intent to deceive has been established, it is difficult to understand that the fraud was not committed grossly." Alabama Farm Bureau Mut. Cas. Ins. Co. v. Griffin, 493 So.2d 1379, 1384 (Ala.1986), citing Shiloh Constr. Co. v. Mercury Constr. Corp., 392 So.2d 809 (Ala.1980). We now proceed to the substantive factors enumerated in Green Oil, supra.

A. Degree of Reprehensibility
In discussing the first guidepost, the United States Supreme Court stated:
"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect `the enormity of his offense.' ... This principle reflects the accepted view that some wrongs are more blameworthy than others. Thus, we have said that `nonviolent crimes are less serious than crimes marked by violence or the threat of violence.'... Similarly, `trickery and deceit'... are more reprehensible than negligence."
BMW, 517 U.S. at 575-76, 116 S.Ct. at 1599 (citations omitted). The reprehensibility of the defendant's conduct is one of the factors Alabama courts consider in the common-law excessiveness review required by Green Oil:
"`The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.'"
539 So.2d at 223. As we noted in BMW II, while this factor has been part of the Hammond-Green Oil review, it perhaps has not heretofore been given the weight in the analysis that the Supreme Court suggested in BMW that it should receive. 701 So.2d at 508-09.
Applying this guidepost to Ford's conduct in this case, we hold that, while the reprehensibility of Ford's conduct justifies a substantial penalty, Ford's conduct does not exhibit the extremely high degree of reprehensibility that would indicate a $6 million punitive damages award. We first note that the record does not reveal that Ford had been punished for similar misconduct prior to this case. As in BMW, the injury inflicted upon the plaintiffs was purely economic in *117 nature, with the conduct indicating no "disregard for the health and safety of others." See 517 U.S. at 576, 116 S.Ct. at 1599. Given that Foster and Sperau were both college educated, possessed substantial business experience, and had the financial capacity to purchase an automobile dealership, it is difficult to conceive that they were especially "financially vulnerable," as that term is commonly understood. See id.; compare Life Ins. Co. of Georgia v. Johnson, 701 So.2d 524 (Ala.1997). However, given Ford's knowledge of the plaintiffs' limited personal wealth in relation to the large amounts they had to borrow to invest, Ford was aware not only that the plaintiffs ran a substantial risk of losing their investment, but also that they might face complete financial ruin if the dealership failed.
We reject the suggestion that Ford's failure to employ or disclose all information in its possession that was purely "race based" was especially reprehensible, or even necessarily unlawful at all. Clearly, much of the information in Ford's possession regarding the past performance of its minority dealerships was not material to the plaintiffs' particular circumstances and did not necessarily bear upon the potential of the specific Selma dealership. Neither Foster nor Sperau ever asked for, or ever showed any interest in, the history of black dealerships generally, despite their substantial investigation into whether they should purchase the dealership. We find their lack of interest in this area unsurprising, for dealers are, of course, individuals, each one bringing to the table a certain amount of capital to invest, relevant experience, diligence, intelligence, contacts within the industry, etc. Similarly, dealerships also exist within a concrete context of a location with a certain market size and economic conditions, sales and profit history, costs, etc. These factors, and undoubtedly others, have an impact, to varying degrees, on the potential and actual performance of a given Ford dealership, and the evidence showed that the plaintiffs' inquiries focused upon these kinds of considerations, to allow them to determine whether they, as individual investors, could run this particular dealership in Selma, Alabama, to produce income at a level to their satisfaction.
Because the sole defining trait of minority dealerships is the race of the dealer, the data on their history ignore the wide range of aspects of both the individual dealers and the specific dealerships they operate that are encompassed within the population and the business environment. But if one accepts that Foster's race alone entitles him to be told the known history of all minority dealers or requires the preparation of a "race-specific" forecast, then one is also recognizing that a primary determining factor of a potential dealer's ability to compete and succeed in operating a particular dealership is race. We do not acknowledge such a proposition, nor have we ever held that all information on black dealers was "material" within the context of this case.
If one hypothesizes that Ford attempted to rationalize a discriminatory policy against qualified minority members seeking to purchase dealerships by pointing to the data showing that, on average, black dealers were much less successful than white dealers, one can imagine the swift and harsh response. The admonition would likely be, in effect, "Such statistics, even if true, are not material because Ford is not permitted to evaluate potential dealers based upon racial generalizations or stereotypes. Rather, it must judge each by using criteria regarding the potential dealer's individual abilities and qualifications that are reasonably thought to bear upon the capacity to successfully operate a particular retail automobile establishmentand race is, emphatically, not one of those qualities deemed material to that capacity." But if, on the other hand, Ford demonstrated that it denied approval to a minority dealer on the specific "race-neutral" grounds that the applicant lacked sufficient capital and experience in the automobile industry, such reasons, if not merely pretextual, would be legitimate. See Brown v. American Honda Motor Co., 939 F.2d 946 (11th Cir.1991), cert. denied, 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992).
So too in this case. If the fact that an applicant is African-American would not be material to the applicant's ability to operate the dealership in the hypothetical discriminatory *118 context stated above, that same fact cannot be material to that issue here either. The information on the history of minority dealers cannot be material because of what it might show about the outlook for a prospective dealer because he is of a racial minority, but rather only for what it might reveal about characteristics other than race that are thought to have a bearing on the plaintiffs' chances for successful operation of the dealership.[2] When Ford prepared the revised forecast that purported to be a reasonable prediction for the plaintiffs' operation of the Selma dealership, the minority dealership data alerted Ford to the fact that the plaintiffs shared with the minority-dealer body some of the most significant traits, most notably a sharp lack of experience in automobile sales, that Ford itself had identified as impeding performance. In addition, the minority dealer reports revealed that newly appointed dealers, such as these plaintiffs, regularly experienced "marginal profitability" because of start-up problems and higher fixed costs. These factors, as Ford was aware, weighed very heavily against its forecast of immediate and substantial improvement over the performance of an experienced, established dealer in the same market.
The evidence of the specific history of the Selma dealership known to Ford also would allow the jury to reasonably infer that Ford knew its forecast was misleading. In the prior owner's seven years of operation, the Selma dealership had never generated more than a $193,000 profit (or 55% return on the prior owner's smaller capital investment) in any year and had averaged only about $96,000 annually.[3] Referring to this performance, Bill Stang, Ford's Atlanta District sales manager, stated that "from the profitability standpoint [the Selma dealership] was a very, very excellent dealership under the prior owner." Yet, Ford represented to the plaintiffs that it was reasonable to expect profits of $274,000 and $350,000, and returns of 51.2% and 65.4%, for the plaintiffs' first two years of operation in the same market. In addition, the plaintiffs' expert economist, Dr. Charles Carter, stated that the forecast figures were unreasonable and, as an example, pointed out Ford's use of what he called "fairly heroic growth rates" for projected new vehicle sales. Carter noted that in 1987, the prior owner's last year of operation, which Stang conceded was a "good year" for Ford, the dealership had sold 381 new vehicles and had cleared $732 per vehicle. Ford's forecast, however, projected that Foster and Sperau could be expected immediately to increase the number of new vehicles sold to 465 and 557 in the first two years, while simultaneously increasing the profit on each to $926. Carter indicated that, in his opinion, the chances of such immediate and significant increases over the performance of the established dealer both in the number of units sold and in the profit per unit, in the same market, were extremely remote.
Further, there was evidence suggesting that even Ford Credit representatives did not find that Ford's sales and profit forecast or capital requirement for Selma was reasonable and that it recognized that the plaintiffs would be in an exceedingly precarious financial situation in operating the dealership. After the plaintiffs had raised approximately half of the required capital investment, they sought financing for the rest in a loan from *119 Ford Credit. Gary Birdsong, a Ford Credit employee in Dothan, performed an initial credit analysis on the plaintiffs' file and recommended that the loan application be rejected, concluding, "The debt structure will be high and ability to meet monthly expenses is based primarily on the Sales and Profit Forecast as prepared by Ford Motor Company. Risk to Ford Credit appears to be poor." Birdsong also noted that Foster and Sperau's "tangible-based capital," basically a measure of net worth, and "working capital," the money with which the business has to operate, both appeared to be "inadequate"; and he later stated that the percentages were "extremely low" in relation to recommended guide amounts. Birdsong's superiors at Ford Credit's main office in Dearborn, Michigan, similarly concluded that the loan should be rejected. David Cottingham, the Ford Credit staff operations manager, recommended rejection, primarily based upon Foster and Sperau's lack of experience in the automotive industry, their limited net worth, and what would be a heavy debt. Cottingham's superior, John Chadwick, similarly agreed that the loan request should be rejected because, he said, River City was not "really a minority dealer, [the] operators lack... experience and ... ability to get operating capital if they have start up problems [and they] have borrowed to their capacity now."
Based on the foregoing evidence, the jury could have reasonably inferred that Ford knew that its forecast for the particular Selma dealership was unreasonable and that it made the representations with the intent to mislead and deceive the plaintiffs, for the purpose of inducing the plaintiffs to purchase the dealership when they would not have done so otherwise. Clearly, this case is unusual, though, in that many of the interests of Ford and the interests of the plaintiffs were closely aligned. This is not a situation where a defendant fraudulently induced the plaintiffs to invest for the malicious purpose of wrongfully appropriating for itself the plaintiffs' property. The evidence gives every indication that Ford intended and hoped that the Selma dealership would flourish under the plaintiffs' direction and would stand as a shining example of the success of its Minority Dealer Program. As the jury found, Ford Credit, Ford's wholly owned subsidiary, was owed $635,000 on loans it had made to the dealership; these loans were made, as the plaintiffs themselves emphasize, only because of urging by the parent Ford corporation, despite unanimous initial recommendations by Ford Credit employees to reject the application because of the likelihood that the funds could never be repaid. Thus, it was only because of Ford's commitment, despite its knowledge that the plaintiffs had limited assets with which to secure the loans, that the plaintiffs were able to borrow in the first place most of the funds that are the basis for the actual damages award. It is undisputed that, far from deriving a benefit from the failure of the plaintiffs' dealership, Ford would absorb losses associated with locating a replacement dealer and that its own image, and that of its Minority Dealer Program specifically, would suffer as well as the result of such a failure.[4] Based upon the evidence, we conclude that the only "injury" Ford could be said to have actually intended is that the plaintiffs would acquire a dealership that Ford knew possessed a smaller profit potential than forecast and placed the plaintiffs at greater financial risk than represented.
We conclude that Ford's conduct manifests only a moderate degree of reprehensibility. The fraud in this case will support a significant punitive damages award only because, by purposefully and intentionally deceiving the plaintiffs about the true prospects of the dealership, Ford knowingly exposed them to the substantial possibility of financial catastrophe. While only some of the data on the minority dealers were actually material to the plaintiffs' operation of the Selma dealership, the reports on the minority dealer program did indicate "race neutral" considerations material to the plaintiffs' circumstances that Ford recognized *120 would very likely hinder their chances of achieving the forecast performance. Further, there was also evidence presented that contrasted the forecast with the past profitability of the Selma dealership itself; this evidence strongly indicated the forecast was unreasonable. However, the record does not show that Ford persisted in fraudulent conduct despite prior punishment, and its actions threatened neither health nor safety. The evidence shows that Ford did not intend to wrongly or maliciously appropriate the plaintiffs' property or intend that they lose their investment. Indeed, despite Ford's knowledge that its wholly owned subsidiary would probably not be able to recover much of the loan amounts if the dealership failed, Ford made it possible for the plaintiffs to borrow the amounts that form the basis of the awards of actual damages.

B. Ratio of Punitive Damages to Actual or Likely Harm
As to the second guidepost, the Supreme Court noted that the "perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff" and it noted the "principle that exemplary damages must bear a `reasonable relationship' to compensatory damages." 517 U.S. at 580, 116 S.Ct. at 1601. The Court stated:
"Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award.... Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.... In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis."
517 U.S. at 582-83, 116 S.Ct. at 1602-03. (Citations omitted; emphasis original).
The ratio of the $6 million punitive damages award to the $992,000 of actual monetary damage is approximately 6:1. When the plaintiffs' awards for mental anguish, as remitted by the trial court, are included, the total of $1,692,000 gives a punitive:compensatory ratio of about 3.5:1. This ratio is obviously far smaller than the 500:1 ratio in BMW, see 517 U.S. at 581-84, 116 S.Ct. at 1602-03, and is even below the approximately 4:1 ratio that the United States Supreme Court found might be "close to the line" in Haslip, supra. 499 U.S. at 23, 111 S.Ct. at 1046. Thus, it is somewhat difficult to say that in this case the ratio alone "must surely `raise a suspicious judicial eyebrow.'" BMW at 583, 116 S.Ct. at 1603, quoting TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 481, 113 S.Ct. 2711, 2732, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting). This factor does not, in itself, seem to indicate that a substantial remittitur is required. However, given that Ford lacked a malicious intent to wrongfully deprive the plaintiffs of any of their investment, given that Ford made it possible for the plaintiffs to initially borrow most of funds they eventually lost, and given the substantial amount of compensatory damages, we conclude that the conduct in this case indicates that the ratio should not be much greater than 1:1.

C. Sanctions for Comparable Misconduct
The third guidepost stated by the United States Supreme Court in BMW is "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." 517 U.S. at 583, 116 S.Ct. at 1603. State courts making this comparison should "`accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.'" BMW, 517 U.S. at 583, 116 S.Ct. at 1603, quoting Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301, 109 S.Ct. 2909, 2934, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part).
The plaintiffs contend that the Alabama Securities Act, § 8-6-1 et seq., Ala.Code *121 1975, provides the legislative sanction for misconduct most similar to Ford's in this case. That Act prohibits fraudulent conduct by "any person, in connection with the offer, sale, or purchase of any security," § 8-6-17, Ala.Code 1975. The Securities Act designates that a conviction for a knowing violation of the Act is punishable as a Class C felony and also provides for civil liability for damages, costs, and attorney fees. See §§ 8-6-18(a), 8-6-19, Ala.Code 1975. The plaintiffs emphasize that Ford's Don Kitchens, the employee who prepared the revised forecast, testified that a sales and profit forecast is "used more or less as a prospectus for that dealership point."
We recognize that the Alabama Securities Act does protect investor interests somewhat similar to those at issue in this case. Thus, it perhaps could be said that the Securities Act is relevant to demonstrate that the legislature has decided that a serious criminal penalty may be warranted in cases of fraud involving investments generally. However, the assets of the Selma dealership purchased by the plaintiffs are not a "security," as that term is broadly defined by § 8-6-2(10), Ala.Code 1975.[5] This Court has also specifically held that an "investment contract" was not a "security" where a promoter exercised only remote control over a franchisee who conducted his business independently, and, therefore, that in such a situation the Securities Act did not apply. Burke v. State, 385 So.2d 648 (Ala.1980). Given that the subject of the transaction in this case, i.e., the assets of the Selma dealership, so clearly falls outside the subject matter regulated by the Securities Act, we conclude that the Securities Act, and the penalties provided for in that Act, might provide Ford with only limited notice of the severity of the punitive award in this case.
Ford, on the other hand, argues that we should look to the Deceptive Trade Practices Act ("DTPA"), § 8-19-1 et seq., Ala.Code 1975, as providing due process notice of the severity of the possible punishment. Ford claims that its conduct, as found by the jury, could be compared with the conduct prohibited by § 8-19-5(20), which declares unlawful the following:
"In connection with any seller-assisted marketing plan, either misrepresenting the amount or extent of earnings to result therefrom, or misrepresenting the extent or nature of the market for the goods or services, or both, sold or delivered in connection with the plan.... As used herein, `seller-assisted marketing plan' includes any plan, scheme, or system in which for a consideration a buyer acquires goods or services, or both, together with a plan, scheme, or system for the resale of said goods or services, or both."
Ford contends that the Selma dealership is not technically a "seller-assisted marketing plan," but that this section is analogous in that Ford sells vehicles to the dealer and provides the dealer with assistance in reselling the vehicles at retail to the public.[6] Ford emphasizes that a knowing violation of the DTPA carries only a civil fine, of not more than $2,000. § 8-19-11(b), Ala.Code 1975.
Assuming that Ford is correct in arguing that the DTPA provides the best example of *122 a legislative sanction for comparable misconduct, it must be recognized that the Act also grants a statutory private right of action that permits a recovery of up to three times any actual damage, in the court's discretion, plus costs and a reasonable attorney fee. Section 8-19-10(a)(2) and (3), Ala.Code 1975. Ford contends that the proper focus for due process purposes should be upon what the maximum civil fine could be under § 8-19-11(b), rather than on what the maximum recovery might have been had a plaintiff pursued a private action under § 8-19-10. Ford correctly points out that when the United States Supreme Court conducted its analysis under this guidepost in BMW, the Court mentioned only the possible maximum $2,000 civil fine under § 8-19-11(b), not the approximately $12,000 the plaintiff might have recovered in a private action under the DTPA, given the $4,000 in actual damage he had suffered in that case. See BMW, 517 U.S. at 583-84, 116 S.Ct. at 1603. However, we discern no reason why the $2,000 civil fine, rather than the potential liability delineated under § 8-19-10, is a more reliable expression of the legislature's judgment as to what is the appropriate punishment for conduct comparable to Ford's. Indeed, given that the legislature specifically granted the private right of action with the possible recovery of treble damages and, as well, preserved the availability of common law and statutory remedies for fraud,[7] it could easily be argued that the legislature implicitly recognized that a maximum $2,000 civil fine per violation is affirmatively not an appropriate penalty for all such violations because the varying degrees of plaintiffs' injuries and defendants' culpability dictate a greater degree of flexibility in punishment. We also do not see why the civil fine would provide materially superior notice to a defendant who might be equally subject to the liability that has been legislatively established under the private right of action.
As we recognized in BMW II, a $2,000 statutory penalty for deceitful conduct is so meager that there is little basis for comparing it with any meaningful punitive damages award. 701 So.2d at 512-13. However, we conclude that the statutory maximum liability that would potentially exist under the DTPA's private right of action in this case does provide an amount that can be meaningfully compared to the punitive damages award. The plaintiffs' actual economic damage in this case, as found by the jury, amounted to $992,000. So the maximum total recovery permitted for a violation of the DTPA under the private right of action of § 8-19-10, treble damages plus costs and reasonable attorney fees, would be somewhat over $3 million. A punitive award of $1,792,000, added to the $992,000 award for economic loss and the $700,000 award for mental anguish, results in a total recovery of $3,484,000.

D. Removing the Defendant's Profit
In a Hammond-Green Oil review, we are required to determine whether, if the wrongful conduct was profitable to the defendant, the punitive damages removed that profit and were in excess of the profit, so that the defendant recognizes a loss. Green Oil, 539 So.2d at 223. The plaintiffs argue that Ford derived from its fraud an amount of money exceeding $15 million, which was the total amount of Ford products sold and interest paid by the River City dealership. The plaintiffs also emphasize that Ford obtained substantial benefits through its recruitment of minority dealers, such as the plaintiffs. They cite, for example, that the 1987 report to Ford's board of directors recognized that the minority dealers had sales that year totaling approximately $1 billion. Finally, the plaintiffs allege that the Minority Dealer Program provided Ford the added benefits of positive corporate image and allowed Ford to keep dealerships in less desirable geographical locations in business.
We conclude that Ford did derive at least some temporary benefits as a result of its fraudulent misrepresentation and suppression in this case but that determining a specific *123 dollar amount of profit is difficult. We find the $15 million figure cited by the plaintiffs to be highly exaggerated, for it simply represents the gross sales of River City Ford, not the profits to Ford itself. The profits flowing to Ford from those retail sales would have been only some unknown fraction of the gross sales. But even if that direct profit was discernible, more problematic for the plaintiffs' position is the fact that there is no evidence to suggest that no one else would have run the Selma dealership had the plaintiffs decided not to invest. It is true that the evidence indicates that Ford was having trouble attracting a minority dealer to Selma. But as the plaintiffs themselves emphasize, Ford, in insisting that the Selma dealership be operated by a minority dealer, had blocked at the last moment a proposed sale to a local white Lincoln-Mercury dealer who had sought to expand his business. Thus, there is every indication that Ford, absent its fraud, might have had to settle for a white dealer in Selma, but nothing suggests anything approaching a $15 million direct profit to Ford. As Ford points out, if there is any reasonable inference to be drawn from the evidence it is that Ford probably surrendered some immediate profits from sales of Ford products that likely would have resulted from having a more experienced dealer than the plaintiffs operating in Selma.
In addition, the issue we address here is the profit Ford derived from its specific fraudulent conduct in this case, not the benefits Ford may have obtained from its lawful, indeed laudable, voluntary affirmative action program as a whole. We agree that the evidence would reasonably allow the finding that the Minority Dealer Program sooner or later improves Ford's overall profits by providing Ford a positive corporate image, by increasing sales to minorities, and by keeping open some of its dealerships that otherwise might close. But adding a single minority Ford dealer in Selma, Alabama, translates only into some small incremental benefit to the program as a whole. Concentrating on benefits to Ford from the entire Minority Dealer Program may help one to understand Ford's motivation for attempting to attract minority investment, but such a focus can be misleading to one attempting to assess Ford's profit in this case.
It does appear, however, that Ford valued the Selma dealership as especially attractive for its potential to advance the image of both Ford generally and the Minority Dealer Program specifically. Given Selma's national association with the civil rights movement, Ford believed that the operation of a successful minority dealership there would demonstrate both the viability of minority dealerships in the program and Ford's resolve in giving opportunities to minorities. Thus, a minority dealer in Selma might have increased Ford sales to minorities locally and perhaps would have encouraged other minorities to similarly invest in a Ford dealership, although, as noted above, the record does not suggest that the consistently profitable Selma dealership was in any danger of closing absent the plaintiffs' investment. However, in terms of "removing" the defendant's wrongfully obtained profit in this case, it is difficult to see that Ford has still retained any significant profit it might have anticipated. An attempted minority dealership in Selma might allow Ford to be viewed as having extended an opportunity to a minority dealer, but the dealership's visible failure would likely only discourage future minority investment.

E. The Financial Position of the Defendant
This Court has acknowledged that a defendant's financial position is relevant to determining the propriety of an amount of punitive damages. Green Oil, 539 So.2d at 223. "[F]or punitive damages to be effective the amount of damages `ought to be large enough to hurt. It ought to sting in order to deter[; this] is its purpose.'" Associates Financial Services Co. of Alabama, Inc. v. Barbour, 592 So.2d 191, 199 (Ala.1991), quoting Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125, 127 (Ala.1981) (Jones, J., concurring specially). However, as the United States Supreme Court has stated, "plaintiffs [should] not enjoy a windfall because they have the good fortune to have a defendant with a deep pocket." Haslip, supra, 499 U.S. at 22, 111 S.Ct. at 1045. Thus, in BMW *124 II this Court recognized that "where a defendant has not committed an act that would warrant a large punitive damages award, such an award should not be upheld upon judicial review merely because the defendant has the ability to pay it." 701 So.2d at 514. Also in BMW II, we suggested that a punitive damages award that exceeds 10% of the defendant's net worth could indicate that the award should be reduced, particularly where the defendant's conduct is not highly reprehensible. 701 So.2d at 514.
It is obvious that a punitive damages award of even $6 million does not begin to approach 10% of the net worth of Ford Motor Company. The trial court noted that Ford's net income for 1993 alone was approximately $2.5 billion. Accordingly, a punitive damages award of even $6 million would not have a devastating impact upon Ford's financial position. However, as we have previously noted, Ford's conduct in this case exhibited only a moderate degree of reprehensibility.

F. The Costs of Litigation
Green Oil mandates that a court consider the plaintiff's costs of litigation when reviewing a punitive damages award for excessiveness. 539 So.2d at 223. This policy encourages bringing wrongdoers to trial. Independent Life & Accident Ins. Co. v. Harrington, 658 So.2d 892, 905 (Ala.1994), cert. pet. dismissed, 517 U.S. 1164, 116 S.Ct. 1587, 134 L.Ed.2d 662 (1996). As this Court acknowledged in its original opinion, the costs associated with this trial, in time and money, were substantial. 674 So.2d at 40. However, "all of the costs of litigation would be more than adequately covered" by even a $1,792,000 punitive award in this case. Principal Financial Group v. Thomas, 585 So.2d 816, 818 (Ala.), cert. denied, 502 U.S. 1009, 112 S.Ct. 649, 116 L.Ed.2d 666 (1991).

G. Criminal Sanctions
Green Oil requires that a court reviewing a punitive damages award for excessiveness consider whether the defendant has suffered any criminal sanctions for the wrongful conduct. Any such sanctions might be taken into account to suggest a reduction of the punitive damages award that otherwise would be appropriate. 539 So.2d at 223-24. No criminal sanctions have been imposed upon Ford for its conduct in this case, so this factor does not suggest a reduction of punitive damages.

H. Other Civil Actions
Finally, Green Oil states that if there have been other civil actions against the same defendant, based on the same conduct, this also should be taken into account to suggest a reduction of the punitive damages award that otherwise would be appropriate. 539 So.2d at 224. The record does not reveal that there have been other civil actions against Ford for the same conduct.

Conclusion
We initially determined that Ford's right to due process was not violated by the imposition of a $6 million punitive damages award. However, after reconsidering the amount of the award, in light of the Supreme Court's decision in BMW, we decide that the punitive damages award should be reduced from $6 million to $1,792,000, an amount slightly greater than the amount of compensatory damages assessed by the jury, as reduced by the trial court. Further, a punitive award of $1,792,000 results in a total recovery of $3,484,000, which is fairly indicated by the maximum recovery specifically authorized for the statutory private right of action under the Deceptive Trade Practices Act. Finally, given our conclusion that Ford has not retained significant profit from its fraudulent conduct in this particular case, the reduced punitive award is appropriate. As with the original award, a $1,792,000 punitive award more than covers the plaintiffs' costs of litigation.
The trial court's judgment is affirmed on the condition that the plaintiffs file with this Court within 21 days a remittitur of punitive damages to the sum of $1,792,000; otherwise, the judgment will be reversed and this cause remanded for a new trial.
*125 AFFIRMED CONDITIONALLY.[*]
HOOPER, C.J., and SHORES, KENNEDY, and COOK, JJ., concur.
ALMON, J., concurs in the result.
MADDOX, HOUSTON, and SEE, JJ., dissent.
BUTTS, J., recuses himself.
HOUSTON, Justice (dissenting).
I dissent, for reasons I expressed when this Court released its opinion in Sperau v. Ford Motor Co., 674 So.2d 24 (Ala.1995):
"I am concerned about the effect the tort theories advanced by these plaintiffs may have on the vision of this nation. Those theories are (1) that a person's being a member of a racial minority impairs that person's ability to compete, and (2) that businesses that offer members of minorities the opportunity to compete, without disclosing that alleged racial handicap, can be liable for compensatory and punitive damages if one of the members accepts that opportunity and then fails.
"I am concerned because I do not believe that a person's race impairs his or her ability to compete, and because I believe that to base tort liability on the false premise that it does is to `attempt the Future's portal with the Past's blood rusted key.'**
"Mel Farr, chairman of the Ford Lincoln-Mercury Black Dealers Association, testified in this case, expressing the opinion that qualified minority applicants should have `an opportunity to participate in the ... free enterprise system that says you have the right to fail and you have the right to succeed.' Farr further testified that, in his opinion, it is insulting to suggest that race has anything to do with that success or failure in a business venture.
"There are tens of thousands of franchised new car dealerships in this country that generate billions of dollars in annual sales. The automobile industry, through its franchises, is a major source of small business opportunities in this country. I am concerned that the jury verdict in this case could have a significant negative impact on this country's efforts to make `equal opportunity' a reality of the American economy.
** "James Russell Lowell, The Present Crisis."
674 So.2d at 42.
SEE, Justice (dissenting).
Because of the striking absence of reprehensibility in this case, I respectfully dissent from the award of $1,792,000 in punitive damages.
I would determine the appropriate amount of punitive damages in this case by applying a strict state law reasonableness standard based on the factors established in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), as reinvigorated in Justice Houston's special concurrence in BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) ("BMW II") (Houston, J., concurring specially).[8] Because the trial judge placed sufficient facts and analysis in the record to permit appellate review of the reasonableness of the punitive damages award, it is not necessary to remand this case.[9]
*126 Since the 1960s, the defendant Ford Motor Company ("Ford") has voluntarily conducted a nationwide "Minority Dealer Program," under which it has tried to promote minority participation in the ownership and operation of one of America's largest and most important industries, the automobile industry. Sperau v. Ford Motor Co., 674 So.2d 24, 28 (Ala.1995). In 1988, as part of the Minority Dealer Program, Ford sold an automobile dealership in Selma, Alabama, to Samuel Foster, a black man, and Dee-Witt Sperau, a white man. Id. at 30-32. In an effort to achieve its self-imposed goal for minority dealerships, Ford lowered the price of the dealership and lent Foster and Sperau capital, even though they did not meet the ordinary experience and net worth qualifications for purchasing the dealership. Id. at 31. Ford gave Foster and Sperau a profit forecast that showed profits could potentially reach $274,000 in the first year and $350,000 in the second year of operation, after an initial investment of $535,000. Ford did not reveal to Foster and Sperau that, in the past, the average Ford minority dealer had earned less in profits and had experienced more losses than the average white dealer. Id. at 29. Nor did Ford disclose data showing that new dealers appointed under the Minority Dealer Program usually made only marginal profits. Id. Also, Ford did not disclose to Foster and Sperau that on a smaller capital investment of $348,000 the prior owner of the Selma dealership had earned $193,000 in 1986 and $180,000 in 1987.
Foster and Sperau are college-educated, experienced businessmen. They purchased the Selma dealership from Ford and earned approximately $103,000 in 1988, but lost approximately $4,000 in 1989 and $6,000 in 1990. Id. at 32. The dealership filed a bankruptcy petition in 1991. Id. Foster and Sperau sued Ford, alleging, among other things, fraud and fraudulent suppression, contending that "because the Selma dealership would be a minority-owned dealership, Ford's estimates of potential profits and of the amount of capital required were intentionally misleading, given the information in Ford's possession." 708 So.2d at 114.
The Lowndes County jury returned a verdict for Foster and Sperau. After the trial court reduced the mental anguish awards for Foster and Sperau, the total award was:

Economic Loss $992,000
Mental Anguish:
 Foster $500,000
 Sperau 200,000
 __________
 700,000
Less: Loans due Ford[10] (635,000)
 __________
Net Compensatory Damages $1,057,000
Punitive Damages 6,000,000
 _____________
 Total Jury Award $7,057,000
 =============

Sperau, 674 So.2d at 27-28.
On appeal, this Court adopted the trial court's order and refused to make any reduction in the $6 million punitive award, in large part because:
"`There was ... evidence from which the jury could determine, by a clear and convincing standard, that the deception of the Plaintiffs was committed with Ford's knowledge of the financial condition of the Plaintiffs, their degree of experience, the profitability and loss experience of black dealers participating in the Minority Dealer Program under circumstances similar to the Plaintiffs, and the economic impact the failure of the dealership would have on the Plaintiffs....
"`....
"`Although a Program designed to give black dealer candidates the opportunity to *127 acquire an automobile dealership may be a laudable objective, the end of meeting an extremely aggressive black dealer count does not justify the perpetration of an intentional fraud.'"
Id. at 38-39. The Supreme Court of the United States vacated this Court's judgment and remanded this case for reconsideration in light of BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("BMW"). Ford Motor Co. v. Sperau, 517 U.S. 1217, 116 S.Ct. 1843, 134 L.Ed.2d 945 (1996).
Today, this Court approves a punitive award of $1,792,000. Based on the following analysis, I disagree.
1. Ratio of Punitive Damages to Compensatory DamagesThe jury awarded $6,000,000 in punitive damages, and, after the trial court's offset of loans due to Ford, $1,057,000 in compensatory damages. Sperau, 674 So.2d at 27-28. Because this greatly exceeds the three-to-one benchmark ratio of punitive to compensatory damages, the record must demonstrate clear and specific justification for such a punitive award.
2. ReprehensibilityTo justify a punitive damages award of more than three times compensatory damages, the reprehensibility of the defendant's actions must include: (1) endangerment of the physical health and safety of others; or (2) economic harm resulting from an intentional misrepresentation, deceit, or concealment of a material fact, as set out in Ala.Code 1975, § 6-11-20(b)(1), coupled with either (a) conduct repeated in spite of prior punishment, or (b) a substantial number of similar misrepresentations or acts of concealment. BMW II, 701 So.2d at 517 (Houston, J., concurring specially). Ford's conduct did not endanger the physical health or safety of anyone, and Foster and Sperau did not demonstrate that Ford had engaged in repeated fraudulent conduct despite prior punishment. The record fails to reflect a substantial number of similar misrepresentations of profit potential in Alabama. Ford may not have disclosed the minority dealer performance statistics to black dealer candidates elsewhere in the nation, but there is no indication that such nondisclosure was illegal outside Alabama. This conduct cannot, therefore, be considered in the computation of the punitive award. See BMW, 517 U.S. at 572-73, 116 S.Ct. at 1597 ("Alabama does not have the power, however, to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents."). Thus, an award of more than three times compensatory damages is unwarranted. The question before us, then, is what punitive award, not in excess of three times compensatory damages, is reasonable.
The gist of Foster and Sperau's case was that Ford should have told them that they were likely to fail because Foster was black and most of Ford's black dealers do not perform as well as most of Ford's white dealers. See Sperau, 674 So.2d at 27 ("The plaintiffs claimed that the representations [regarding forecasts of potential profits] were made in order to induce them to purchase the Ford dealership and with an intent to deceive them, based upon Ford Motor Company's knowledge that minority dealerships were less successful than the average dealership.") (emphasis added). In short, Foster and Sperau contend that because most black dealers in Ford's Minority Dealer Program did not perform as well as most of Ford's white dealers, Foster himself was less likely to succeed. Absent a showing, which was not made here, that Foster personally, and his partner Sperau, could not expect to run as profitable a dealership as could an average white dealer, and that Ford knew or should have known this, but suppressed it, I cannot agree with the majority's holding that Ford's minority recruitment effort was reprehensible.
Instead of selling the Ford dealership to an experienced white Lincoln-Mercury dealer in Selma who had offered to buy it, Ford chose to include Foster in its family of dealers so that Ford could achieve social goals that it viewed as more important than a quick profit. Instead of requiring Foster and Sperau to invest $632,000 of capital for the dealership, Ford reduced the required capital investment to $535,000. Sperau, 674 So.2d at 31. Instead of accepting the recommendation of Ford Motor Credit Company ("FMCC") to deny Foster and Sperau extensions of credit, Ford instructed FMCC to make the loans to them. Id. at 31-32. Only *128 by forensic gymnastics can these facts be construed as "reprehensible."[11]
Foster and Sperau were mature, experienced businessmen who engaged in arm'slength negotiations with Ford for the purchase of an automobile dealership under Ford's Minority Dealer Program. The dealership failed. Ford's hopes for profits, like those of Foster and Sperau, went unrealized.
The facts of this particular case, with its absence of genuinely reprehensible acts, justifies only a de minimis punitive award.[12]
3. Civil and Criminal Sanctions for Similar ConductSection 8-19-11(b), Ala.Code 1975, provides a maximum civil fine of $2,000 for a violation of the Deceptive Trade Practices Act, which punishes "fraudulent" conduct similar to that alleged in this case. The level of this fine supports a de minimis punitive award of no more than a few thousand dollars.[13]
4. Profitability of ConductAs the plurality recognizes, Ford made little, if any, discernible profit on the failed dealership. *129 708 So.2d 119. Any reputational benefit Ford received from assisting minorities by advancing its Minority Dealer Program in Selma derives from the admirable nature of Ford's actions. Thus, this factor also supports the imposition of only a de minimis punitive damages award.
5. Financial Position of the Defendant The plurality notes that Ford's nationwide net income for 1993 was approximately $2.5 billion. 708 So.2d 124. Although the net income generated by Ford's operation of its Minority Dealer Program in Alabama would be a more relevant number in this case, the lack of reprehensibility of Ford's conduct supports only a de minimis punitive award and a corresponding de minimis impact on its financial condition.
6. Costs of Litigation The plaintiffs' attorneys tried the case to a jury and did a thorough job of handling the direct appeal and the application for rehearing in this Court. Sperau, 674 So.2d 24-42. There was no evidence of abuse of the legal process. Given the particular facts of this case, a de minimis punitive damages award, combined with the award of $1,057,000 in compensatory damages, including $700,000 for mental anguish, should amply cover the reasonable costs of litigation.
Because of the lack of reprehensibility, and because of Ford's admirable voluntary efforts to include minority dealers in the ownership and operation of its business, I conclude that only a de minimis punitive damages award is reasonable in this case.
I dissent.
MADDOX, J., concurs.
NOTES
[1] The defendant's intent to deceive or mislead, or "scienter," has been the standard prerequisite for imposing punitive damages in fraud cases. See, e.g., Cartwright v. Hughes, 226 Ala. 464, 147 So. 399 (1933); Munroe v. Pritchett, 16 Ala. 785 (1849).

In addition, § 6-5-104(a), Ala.Code 1975, which defines the tort of fraudulent deceit, provides as follows: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers." (Emphasis added.) "`Deceit'... results from either a willful or a reckless misrepresentation or a suppression of material facts with an intent to mislead." Hughes v. Hertz Corp., 670 So.2d 882, 888 (Ala. 1995), citing Whitlow v. Bruno's, Inc., 567 So.2d 1235 (Ala.1990). Deceit is an intentional tort that, when proved to the satisfaction of the finder of fact, will support an award of punitive damages. American Honda Motor Co. v. Boyd, supra.
[2] This may be illustrated by the fact that it becomes more difficult to conceive of the minority dealer data as material as one imagines plaintiffs who do not share traits of the minority-dealer body generally. If one were to assume, for example, that Foster and Sperau were experienced Ford dealers who could transfer in an experienced staff and had large surpluses of capital, it becomes questionable whether any of the minority-dealer data would be at all indicative of their chances to successfully operate a dealership. In fact, under such circumstances, providing a "race-specific" forecast of lower profits or disclosing discouraging information on minority dealers could itself be misleading as to the true potential of the dealership. In addition, Ford clearly may not offer disparate contractual terms, such as capitalization requirements, on the basis of race alone. See Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).
[3] There was evidence to suggest that the profits for the Selma dealership for the seven years under the prior owner, who had made an initial $348,000 capital investment, were as follows: 1981$44,200; 1982$82,000; 1983$74,000; 1984$46,000; 1985$58,000; 1986$193,000; 1987$180,000.
[4] The plaintiffs themselves point out that while Ford and Ford Credit are technically separate corporate entities, Ford Credit's profits are ultimately consolidated as income to Ford Motor Company. Thus, Ford would also indirectly lose if Ford Credit was unable to recover amounts owed to it by the dealership, a likely possibility if the dealership failed.
[5] Section 8-6-2(10) defines "security," for the purposes of the Alabama Securities Act, as follows:

"SECURITY. Any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease, annuity contract unless issued by an insurance company, bankers' shares, trustees' shares, investment participating bonds, investment trust debentures, units, shares, bonds and certificates in, for, respecting, or based upon any form of securities or collateral, subscriptions and contracts covering or pertaining to the sale or purchase on the installment plan of any security as herein defined, or subscription or contracts covering or pertaining to the sale or purchase of beneficial interest in title to property, profits or earnings, or any right to subscribe to any of the foregoing, or any instrument of any kind commonly known as a security."
[6] The DTPA also prohibits "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Section 8-19-5(23), Ala.Code 1975.
[7] We note that the "savings clause" of the DTPA provides that the remedies under that Act do not displace remedies for fraud, misrepresentation, deceit, or suppression that are available under the common law, statute, or otherwise. However, the remedies under the Act and those otherwise available are mutually exclusive. Section 8-19-15, Ala.Code 1975.
[*] Note from the reporter of decisions: On February 10, 1998, the Supreme Court issued the following certificate of judgment:

"WHEREAS, in keeping with the former order and judgment of this Court entered on September 5, 1997, the appellee(s), Dee-Witt Sperau and Samuel R. Foster II, did on September 24, 1997, file in this Court a remittitur of punitive damages tot he sum of $1,792,000.
"IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the circuit court be reduced to $3,484,000 and as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs.
"IT IS FURTHER ORDERED AND ADJUDGED that the appellant, Ford Motor Company, pay the costs of appeal and the costs taxed against the defendant(s) in the court below will stand as taxed."
[8] I adopted this reasoning in Life Insurance Co. of Georgia v. Johnson, 701 So.2d 524, 535 (Ala. 1997) (See, J., concurring in part and dissenting in part).
[9] In Hammond v. City of Gadsden, 493 So.2d 1374, 1379 (Ala.1986), this Court required "trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages."
[10] These loans were made by Ford Motor Credit Company, a subsidiary of Ford Motor Company.
[11] It is difficult to support the rationale of the majority's opinion in Sperau, 674 So.2d at 38-39, which found liability in Ford's failure to disclose race-based statistics. If Ford had presented Foster and Sperau the statistics showing that minority dealers turned in an average financial performance that was less than that of its white dealers, Ford could have exposed itself to legal actions for the subsequent sale of the dealership to a nonminority candidate. Cf. Brown v. American Honda Motor Co., 939 F.2d 946 (11th Cir.1991), cert. denied, 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992). Instead of the Sperau rationale, the plurality today, on reconsideration, develops a post hoc "race-neutral" rationalization to support the $1,792,000 award. Specifically, the plurality now finds a "moderate degree" of reprehensibility in Ford's use of optimistic profit projections because of "race-neutral" factors such as a lack of experience, lack of capital, and the Selma dealership's former return on investment. 708 So.2d at 119. It is difficult to recast these factors as wholly "race neutral," when the very purpose of a minority recruitment program is to compensate for the disadvantage of just these factors.

Moreover, although Ford's forecasts of potential profits of $274,000 in 1988 and $350,000 in 1989 appear optimistic when they are compared to the prior owner's profits of $193,000 in 1986 and $180,000 in 1987, Ford's profit forecasts assumed, and Foster and Sperau made, a greater capital investment$535,000than did the prior owner$348,000. Given the increased capital investment, Ford's forecast of a return of 51.2% and 65% for 1988 and 1989, respectively, is comparable to the previous owner's 55% return in 1986. Indeed, the past profit record of the dealership under its prior owner7 consecutive years of profits, ending with profits of $193,000 and $180,000 in 1986 and 1987, respectivelyand its first year of profits under Foster and Sperau$103,000support Ford's contention that Foster and Sperau's losses were caused not by Ford's optimistic profit forecasts, or by Foster's race, but by Sperau's, and to some degree Foster's, mismanagement. See Sperau, 674 So.2d at 32 (stating the Sperau would be in charge of day-to-day operations, while Foster would visit the dealership once a week).
[12] In Sperau v. Ford Motor Co., 674 So.2d 24 (Ala.1995), this Court decided that an award of punitive damages is appropriate in this case. The only issue properly before this Court on this remand is the determination of the amount of punitive damages. Ford Motor Co. v. Sperau, 517 U.S. 1217, 116 S.Ct. 1843, 134 L.Ed.2d 945 (1996) (remanding for reconsideration in light of BMW).
[13] Although the plurality rejects treble damages as a benchmark for the ratio comparison called for by the Supreme Court in BMW, 517 U.S. at 579-584, 116 S.Ct. at 1601-03, it embraces the treble damages measure of § 8-19-10(a)(2)'s private right of action, as the proper basis for the fixed civil/criminal sanction comparison, also required by the Supreme Court, id. at 583-84, 116 S.Ct. at 1603-04. In BMW, however, the Supreme Court mandated that courts apply both the flexible ratio guidepost and the fixed civil/criminal sanction guidepost. The ratio factor provides a flexible measure of the relationship between actual and punitive damages, while the fixed civil/criminal sanction provides a static measure of the Legislature's judgment of the appropriate maximum fixed penalty for a certain type of wrongful conduct. In applying these distinct guideposts, the Supreme Court noted the use of treble damages as a possible ratio, id. at 581 n. 33, 116 S.Ct. at 1601-02 n. 33, and it specifically used the $2,000 civil fine imposed under Ala.Code 1975, § 8-19-11(b), not the private right of action of § 8-19-10(a)(2), for the fixed civil/criminal sanction guidepost, id. at 584 n. 39, 116 S.Ct. at 1603 n. 39. It is interesting to note that the plurality appears to embrace a 3:1 ratio only when its final punitive damages award produces a ratio of less than 3:1, not when it produces a ratio that is greater than 3:1. Compare today's plurality opinion, 708 So.2d at 120 (embracing the 3:1 ratio as a comparative factor when the final punitive award produces an approximate 1.1:1 ratio of punitive to compensatory damages, based on the plurality's computation of gross compensatory damages) with Life Ins. Co. of Georgia v. Johnson, 701 So.2d 524, 529 (Ala.1997) ("Johnson II") (refusing to embrace the 3:1 ratio as a comparative factor when the final punitive award produced a 12:1 ratio of punitive to compensatory damages).